[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 02-16059

_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
September 1, 2004
THOMAS K. KAHN
CLERK

D. C. Docket No. 98-00260-CV-2-WLS-1

EDDIE LEE JEFFERSON,

Petitioner-Appellee,

versus

RONALD FOUNTAIN,

Respondent-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

**(September 1, 2004)**

Before ANDERSON, CARNES and MARCUS, Circuit Judges.

CARNES, Circuit Judge:

The State of Georgia, through Warden Ronald Fountain, appeals the district

court's grant of habeas corpus relief under 28 U.S.C. § 2254 to Eddie Lee

Jefferson, a state prisoner convicted of rape and related crimes in Turner County,

Georgia.  The district court granted that relief based on Jefferson's claim that his counsel in the state trial was ineffective for failing to file a motion to suppress evidence arising out of an allegedly illegal stop and arrest.  The procedural twists and turns of this case and the legal issues it brings us are unusual.

Jefferson was convicted of charges stemming from three rapes in two Georgia counties.  He was first convicted in Turner County of two of the rapes and related charges, and those convictions were upheld through the state court system.  Then Jefferson was convicted of the third rape and related charges in Irwin County.  Those convictions from that later trial, unlike the convictions from the earlier one in Turner County, were set aside by the Georgia courts on grounds of ineffective assistance of trial counsel.  More specifically, counsel was held to have been ineffective for failing to move to suppress crucial evidence resulting from a vehicular stop by law enforcement officers.

That stop gave rise to essentially the same evidence against Jefferson in both trials, and that evidence was as important to one set of convictions as to the other.  Nonetheless, even after Jefferson's convictions on the Irwin County charges had been set aside, the state habeas court denied relief in regard to Jefferson's convictions in Turner County.  The district court concluded that the state court's decision denying relief was unreasonable enough within the meaning of 28 U.S.C.

2

§ 2254(d) to justify federal habeas relief and granted it.  In order to explain why we disagree, we begin with the particulars of the factual and procedural history.

## I.

## A.

Between December 21, 1989, and August 2, 1990, three rapes occurred in Turner and Irwin Counties, Georgia:  (1) the December 21, 1989 rape of Shannon Tucker in Irwin County; (2) the December 29, 1989 rape of Christina Bacon in Turner County; and (3) the August 2, 1990 rape of Candace Greer in Turner County.  Jefferson was prosecuted in each county for the rapes occurring there. The Turner County prosecution came first.

The Turner County indictment charged Jefferson with two counts of rape (one of Greer and the other of Bacon), two counts of burglary, one count of armed robbery, and one count of aggravated assault.  The state trial court appointed Herbert Benson to represent Jefferson in relation to those charges.  All three victims testified at the Turner County trial, even though the charges covered only the two rapes that occurred in that county.

Candace Greer testified that at about 2 a.m. on August 2, 1990, a man broke into her trailer in Sycamore, which is in Turner County, Georgia.  She was asleep on her sofa in the living room.  Her children – daughters aged 4 and 5 – were asleep

3

in the bedroom right next to the living room. Ms. Greer was awakened when the assailant put his hand over her eyes, told her not to open them, and put a knife to her throat. The assailant took the pillowcase off the pillow she had been using and blindfolded her with it. He then asked where her wallet was, and she told him it was in the kitchen. He walked her to the kitchen and got her purse and took money out of it. After confirming that was all the cash she had, he said "that he guessed he was going to have to rape [her] now to get . . . something out of it[;] that he couldn't come without getting something."

The assailant then told Greer to take her clothes off. She begged him to just take the money and not to do it, but he told her that he had to. He moved her to the living room and raped her on the couch. Then he moved her to the floor and raped her again. He held a knife to her throat the whole time, and also told her that he would kill her and her two daughters if she did not comply. She never actually saw the assailant, but said that she could tell by his voice he was black.

Christina Bacon testified that on December 29, 1989, she was thirteen years old. Sometime between 5:10 and 6:13 a.m. on that date she was awakened by the sound of someone going through her things in the bathroom of the house where she lived in Sycamore, Georgia. The light was on in the bathroom and the door was ajar. Thinking it was her mother or sister in the bathroom, she went back to sleep.

4

Bacon awoke when someone's hand covered her mouth. She tried to scream, but her assailant hit her over the head twice with something that appeared to be a crowbar and told her that if she didn't shut up he would hit her again. At some point after saying that, he hit her again – she was hit with it a total of four times during the course of the attack, but she never lost consciousness. After hitting her, the assailant took off his clothes and raped her. At some point during the rape, he told her that "before he could leave first he had to come" and then it would be over and she could get a doctor. She told him she needed a doctor. She asked if he had a gun, and he said yes. She asked him to shoot her. He replied "shoot you?" and laughed. He asked "why would I want to do that?" and she told him she was in so much pain she wanted him to either shoot her or get her a doctor.

After the rape, the assailant told Bacon not to move for ten minutes, and put a pillow over her face. He was in her home a total of 25 to 45 minutes, and she had the opportunity to observe his face, face-to-face, for about three to four minutes. She identified Jefferson in court as the man who had assaulted her.

Shannon Tucker lived in Irwin County. She testified that on December 21, 1989, when she was 15 years old, she was babysitting her cousin, Sarah McCranie, who was 7 or 8 years old. At about 9:30 or 10 a.m. that day a black man whom she did not know entered the bedroom where she was. He was wearing underwear on

5

his head.  Tucker and McCranie began screaming.  The man told them to shut up or he would kill both of them.  They became quiet and begged him not to hurt them.  The man came over to Tucker and put his hand over her mouth and dragged her off the bed.  He told McCranie to stay in the bedroom, and forced Tucker down the hall, holding her around the neck under his arm.  Around this time the underwear came off his head.  Tucker told him he could take anything he wanted and asked that he not hurt her or McCranie.

The man dragged Tucker into the kitchen where he grabbed a butcher knife.  While holding the butcher knife to her neck, he told Tucker not to look at him or he would kill her.  He then took Tucker to the living room and placed her standing in front of the couch.  He began undressing her and again told her not to look at him or he would kill her.  Tucker was crying and trying to get away.  He took her clothes off, held her down, and raped her. During the attack Tucker had the opportunity to look at his face for 3 to 5 minutes or so.  At the Turner County trial, Tucker identified Jefferson as her assailant.  Her young cousin, McCranie, also testified that Jefferson was the man who broke into their house that morning.

**B.**

The facts involving the investigation of the Greer rape in the early morning hours of August 2, 1990, are of particular importance to the legal issues arising

6

from the stop of Jefferson later that day, and thus to the ineffective assistance claim against his trial counsel for failing to move to suppress the fruits of the stop.

Although unsure of the time, Candace Greer's best estimate is that she was raped around 2:00 a.m. that morning. The same day it had happened, Georgia Bureau of Investigations Agent J.B. Rickenson, the chief investigator in the case, canvassed the neighborhood surrounding the Greer house to see if anyone had heard or seen anything during the night. He learned from the Mayos that sometime between 5:15 and 5:25 a.m. Eddie Jefferson, a black man, had come to their house seeking help. His truck was stuck in a ditch beside a cornfield, approximately four-tenths of a mile from the Greer house. They helped him get it out.[1]

That same day Agent Rickenson examined both the ditch where the truck had been stuck, and Greer's house and its surroundings. He photographed tire tracks and shoe prints around the ditch as well as shoe prints around Greer's house. The record is silent about whether any comparative analysis of the shoe prints was done that day.

---

[1] Tommy Williams, who lived in the area, testified at trial that he had seen a truck similar to Jefferson's in a ditch at 2:30 a.m. that morning, with a black man standing by the truck. Williams' testimony, when combined with that of the Mayos, places Jefferson a half mile from the scene of the early morning rape just minutes after it took place. However, there is nothing in the record to indicate whether any law enforcement agents knew about what Williams had seen before they stopped Jefferson at approximately 10:00 p.m., which was some 19 hours after Williams had spotted him standing beside his stuck truck.

Based on the information from the Mayos that Jefferson had been in the area of the rape early that morning and had gotten his truck stuck in a ditch, investigators wanted very much to question him. Around 10 p.m. the day of the rape, Jefferson was driving his truck on a public street with his children when he was pulled over by two police cars flashing their blue lights. After Jefferson pulled over, the blue lights were turned off. Jefferson got out of his car, and three officers approached him while one remained in one of the police cars. The officers identified themselves and spoke with Jefferson for a few minutes. It is unclear whether weapons were drawn or only showing because some of the officers were in uniform.[2] One of the officers asked Jefferson if he would be willing to come down to the sheriff's office to discuss an investigation that was underway in Turner County. Jefferson replied very positively, saying "Sure."

With Jefferson's consent, a deputy drove Jefferson's vehicle and his two children to Jefferson's mother's house, which was nearby. Jefferson was driven to the sheriff's office in the sheriff's patrol vehicle – a marked vehicle – with three officers present. Jefferson sat in the back with the sheriff. The inside door handles

---

[2] The district court stated that the police officers guns were drawn. The state habeas court made no such finding. Testimony at the Turner County trial is ambiguous. We need not be concerned with this factual issue, however, because later in this opinion we will assume for purposes of deciding the case that the stop itself was an arrest.

8

were in place in the backseat and there was no cage. An occupant of the back seat could have gotten out. Agent Jack White testified that Jefferson was not placed under arrest at that time, and that nothing was done to limit his ability to come or go.

Jefferson testified in the state court habeas hearing that at the time he went with the officers he didn't feel he had any choice. His testimony, however, was impeached by that of his trial counsel, Herbert Benson. In explaining why he had not moved to suppress the evidence resulting from the stop, Benson testified: "I talked to [Jefferson] at length about whether or not he was ever coerced, whether or not they forced him to go, or whether he went freely or voluntarily. And every time I talked about that, his statements were, you know, he went freely and voluntarily with the officers."

The state habeas court credited the testimony of attorney Benson and Agent White over that of Jefferson. It found truthful Benson's habeas hearing testimony that Jefferson had told him repeatedly that he had gone with the officers freely and voluntarily, and White's trial testimony that Jefferson was free to go at any time prior to his actual arrest. That arrest, Rickenson explained, did not occur until after Greer identified Jefferson by his voice. The district court, in sharp contrast, found that Jefferson "did not willingly accompany police after the traffic stop, he went

9

with police because he was in fact under arrest." We need not resolve this conflict, because it ultimately does not matter to our disposition of the case. See n.2, above.

Upon arrival at the sheriff's office, Jefferson was taken into a room to be interviewed by Agent Rickenson. The reason Jefferson was not read his Miranda warnings, according to Rickenson, is that the questioning was merely exploratory in nature and the officers had no information that would have enabled them to detain Jefferson if he had sought to leave the office. Rickenson explicitly told Jefferson that he was not in custody.

At some point during Agent Rickenson's interview of Jefferson, Candace Greer was brought to the sheriff's office to listen to Jefferson's voice. Upon hearing his voice, Greer immediately began sobbing, gesturing, and shaking, and identified Jefferson as the man who had raped her. When Rickenson was told that Greer had identified Jefferson's voice as that of her assailant, he arrested Jefferson and read him his rights. Jefferson's clothes and shoes were taken as evidence, and he was photographed. His photograph became part of an array, from which Christina Bacon, Shannon Tucker, and Sarah McCranie later identified Jefferson as the assailant in the other two rapes.

A few days after the arrest, search warrants were issued for samples of Jefferson's hair and blood. The crime lab later reported that the shoes he had on

10

when arrested were similar to those that had left prints outside Greer's residence. Jefferson's hairs were found to be consistent with two hairs recovered from Greer's residence.

## C.

During Jefferson's Turner County trial on charges resulting from the Greer and Bacon rapes, a <u>Jackson v. Denno</u>, 378 U.S. 368, 84 S. Ct. 1774 (1964), hearing was held to determine the admissibility of statements Jefferson had made at the sheriff's office prior to his formal arrest and before he had been Mirandized. The issue, as the trial court phrased it, was whether Jefferson was in custody at the time the statements were made. This is how the trial court decided that issue:

> There is no question in the court's mind but that he was in custody from the time that he was stopped with the blue lights. And I think the law backs that up whole heartedly. Now, the next part though, I don't see anything in his statement that was inculpatory and I don't see anything–I don't think that it is–and he was not the target of the investigation as I understand it until the probable cause arose from the reaction of the victim. So I don't think <u>Miranda</u> applies. I think it was an in-custody interrogation.

<u>Georgia v. Jefferson</u>, No. 7410, Transcript 321-22 (Superior Court of Turner County 1991).

With that explanation, the trial court ruled that Jefferson's statements were admissible. The court went on to say, however, that "if he goes any further and does make anything in remarks for inculpatory [sic], the court is on the motion of

11

this defendant I'll just tell you, I'll have to grant a mistrial. I think you'd be wasting money not to." Id. at 324. No inculpatory statements were ever offered, but Jefferson argues that by saying that it would suppress any that were, the court "practically invited" trial counsel to move to suppress the non-statement fruits of the stop. Counsel did not do so.

At the conclusion of the Turner County trial, Jefferson was convicted of two counts of rape, two counts of burglary, and one count of aggravated assault. He was sentenced to consecutive life sentences plus 20 years. Jefferson, still represented by Benson, filed a direct appeal to the Georgia Court of Appeals. He raised eight issues, none of which involved suppression of evidence. The Georgia Court of Appeals affirmed the Turner County convictions. Jefferson v. State, 425 S.E.2d 915 (Ga. Ct. App. 1992) (Jefferson I).

**D.**

After his unsuccessful appeal in the Turner County case, Jefferson, again represented by Benson, was tried and convicted in Irwin County for the rape of Shannon Tucker, for burglary, and for possession of a knife during commission of a felony. That trial utilized much of the same evidence arising from the stop of Jefferson on August 2, 1990, as had the Turner County trial. Following his Irwin County convictions, Jefferson obtained new counsel and directly appealed. This

time he raised a claim of ineffective assistance concerning the failure of trial counsel to move to suppress the evidence flowing from the August 2, 1990 stop. On the basis of that claim, the Georgia Court of Appeals reversed the Irwin County convictions. Jefferson v. State, 459 S.E.2d 173 (Ga. Ct. App. 1995) (Jefferson II).

The Georgia appellate court concluded that Jefferson had been illegally seized before he consented to accompany the police to the sheriff's office, and that the interview and evidence acquired as a result of that seizure were tainted by the "patently illegal" arrest. Id. at 174-78. The court then reasoned that trial counsel Benson had erred by failing to move to suppress that tainted evidence, which included Greer's voice identification, Jefferson's hair, his shoes, and his photograph which had led to the visual identifications by Bacon, Tucker and McCranie.

Because of the weight of the tainted evidence, the appellate court concluded that, but for Benson's error, the result might have been different. Accordingly, it held that Jefferson had been deprived of the effective assistance of counsel, reversed his conviction, and remanded for a new trial. Id. at 178. In doing so, the appellate court noted that "the issues presented in this case would have applied with equal force had they been presented for review in Jefferson I." Id. at 175 n.2.

13

On remand, Jefferson was retried on the Irwin County charges without the evidence resulting from the stop, and he was acquitted.

After that turn of events, Jefferson was left in prison serving his sentences on the Turner County convictions. Unhappy about that, he filed a pro se habeas petition in state court challenging his Turner County convictions on a number of grounds, one of which was his trial counsel's failure to move to suppress the evidence arising from the August 2, 1990 stop. The state habeas court held an evidentiary hearing during which Jefferson was represented by new counsel. At that hearing, the court heard testimony from Jefferson and Benson.

The state habeas court was in an unusual position when it decided whether Benson's failure to move to suppress the fruits of Jefferson's allegedly illegal stop and arrest in the Turner County trial constituted ineffective assistance. When the court had that issue before it, the Georgia Court of Appeals in the Irwin County case, Jefferson II, had already found Benson ineffective for failing to move to suppress the fruits of the very same stop, which the appellate court had characterized as "patently illegal." 459 S.E.2d at 177. Nonetheless, the state habeas trial court concluded that Jefferson had failed to satisfy either the performance or the prejudice prong necessary to demonstrate ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984).

14

The state habeas court did not feel constrained by the appellate court's decision in Jefferson II. Although it acknowledged that much of the evidence suppressed at the Irwin County retrial was used in the Turner County trial, the court stated that under Strickland ineffective assistance claims must be decided on a case by case basis. The court concluded that despite the similarities between the Irwin County and Turner County trials, Jefferson II did not control its decision because it was a different case with different victims, juries, witnesses, and evidence. It failed to explain how the evidence differed in any material way between the two trials.

As for the performance prong, the state habeas court correctly set out the Strickland standard. It pointed out that in Jefferson II the Georgia Court of Appeals' conclusion that Benson's performance was deficient was based in part on two decisions, Vansant v. State, 443 S.E.2d 474 (Ga. 1994), and Burnham v. State, 453 S.E.2d 449 (Ga. 1995), that had come out after Benson's performance at the Turner County trial. Declining to rely on those two decisions, because they were unavailable to Benson at the time of the trial, the state habeas court concluded:

> Considering all of the circumstances at the time of trial, including the precedent upon which trial counsel relied, this court finds that counsel's decision to forego filing a motion to suppress based on an illegal arrest did not fall below an objective standard of reasonable[ness]. Thus, this Court finds that [Jefferson] has failed to demonstrate the first prong of the test

15

enunciated in <u>Strickland v. Washington</u> for establishing a claim of ineffective assistance of counsel.

<u>Jefferson v. Hicks</u>, No. 97V-0141, at 12-13 (Superior Ct. of Ware County 1997).

As an alternative basis for its denial of relief, the state habeas court held that Jefferson also had failed to establish the <u>Strickland</u> prejudice prong.[3] In the beginning of that part of its discussion, the court misstated the requirement as putting the burden on the petitioner to prove that the outcome of his trial was "actually prejudiced" by counsel's errors. Later in its discussion, the court correctly referred to and quoted the "reasonable probability"of a different result standard from <u>Strickland</u>.

Applying the correct standard, the state habeas court concluded that, even in the absence of the evidence that would have been suppressed, the weight of the non-tainted evidence at trial was such that Jefferson could not demonstrate that a reasonable probability the result at trial would have been different absent the alleged error. In reaching that conclusion, the court counted as "non-tainted" the following evidence: Christina Bacon's in court identification of Jefferson as her assailant; Candace Greer's testimony as to the modus operandi of her attacker, and

---

[3] To establish that counsel's performance was constitutionally ineffective, a defendant must show both that (1) counsel's performance was so deficient that it fell "below an objective standard of reasonableness"; and (2) the defendant suffered "actual prejudice," in "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 687, 104 S. Ct. at 2064.

16

its similarity to that described in Bacon's testimony; Greer's description of her attacker's voice as "gruffy . . . real definite . . . real distinctive," and its similarity to Bacon's description of her assailant's voice as "kind of husky–I mean, not real husky but distinctive;"[4] the evidence of Jefferson's adventure in the cornfield ditch the morning of the Greer rape; Tucker's testimony describing her similar attack–a home invasion with a weapon followed by rape–in Irwin County eight days before Bacon was attacked; and Tucker's and McCranie's identifications of Jefferson at trial.  Given the availability of all that non-tainted evidence, the court believed that Jefferson had failed to demonstrate that his counsel's failure to file a motion to suppress had prejudiced him, as required by Strickland's second prong, "such that he was deprived of a fair trial or that the result of his trial is not reliable."

Jefferson next petitioned the Georgia Supreme Court for a certificate of probable cause to appeal from the denial of his state habeas petition.  That petition was denied without explanation.

**E.**

Following the denial of relief from his Turner County convictions in his state habeas proceeding, Jefferson filed a petition in federal district court for relief from them pursuant to 28 U.S.C. § 2254.  The district court granted the petition,

---

[4] The court also may have had in mind the jury's comparison of these descriptions with Jefferson's actual voice, because he did testify at the Turner County trial.

17

effectively setting aside Jefferson's convictions, after measuring the state court decision against the standards of § 2254(d)(1) and concluding that the decision was both contrary to and an unreasonable application of the clearly established federal law governing both the performance and prejudice prongs of the Supreme Court's Strickland decision.

As to the performance prong, the district court thought the state habeas court had failed to recognize that Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868 (1968), and Dunaway v. New York, 442 U.S. 200, 99 S. Ct. 2248 (1979), governed whether the evidence flowing from Jefferson's arrest should have been suppressed on grounds that the stop violated the Fourth Amendment. Those two decisions, the court thought, were "clearly established federal law" that a detention without probable cause under the circumstances of this case is unconstitutional. In reaching that conclusion the district court found as fact, contrary to the state habeas court's findings, that Jefferson did not willingly accompany police after the traffic stop, but instead was under arrest. Given the illegality of Jefferson's detention, the court reasoned that under Strickland it was unreasonable for trial counsel not to have filed a suppression motion.

The district court also concluded that the state habeas court's analysis of the prejudice prong was contrary to and an unreasonable application of the Strickland

18

decision. The district court thought the state habeas court had applied a standard

that required Jefferson to prove the result of his trial actually would have been

different instead of demonstrating a reasonable probability of a different result.

The higher standard would have been contrary to the clearly established federal

law set out in Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. The state habeas

court's rationale that there was sufficient non-tainted evidence to support the

convictions was also an unreasonable application of the Strickland prejudice prong,

the district court believed. According to it, the question the state court should have

answered but did not is whether there was a reasonable probability that admission

of the tainted evidence had affected the outcome of the trial. Besides, the district

court said, much of the "non-tainted" evidence the state habeas court relied upon

for its result probably was subject to suppression as fruit of the initial illegal voice

identification of Jefferson by Greer. Because that voice identification would have

been suppressed upon a proper motion, the reasoning goes, so would most of the

other evidence against Jefferson.

## II.

Under our view of this case, there are a number of issues we need not

decide.[5] We need not decide if the stop of Jefferson by the officers with their

---

[5] Our approach to the case is based upon the understanding that if a state habeas court
denies relief where we would have done so if we were conducting de novo review, federal

flashing blue lights, which led to his going to the sheriff's office, was an illegal detention. We will assume it was. We need not decide if the failure of trial counsel to file a motion to suppress the evidence that resulted from Jefferson going to the sheriff's office was deficient performance under the Strickland standard. We will assume it was. We need not decide if much of the evidence the state habeas court described as non-tainted by any illegality of the stop was in fact tainted, as the district court thought. We will assume it was.

Making all of these assumptions in favor of Jefferson's position, he still was not entitled to have a motion to suppress the evidence resulting from the stop and ensuing interview granted; he was not, because of the inevitable discovery exception to the exclusionary rule. That exception was adopted by the Supreme Court in Nix v. Williams, 467 U.S. 431, 104 S. Ct. 2501 (1984), and under it evidence that results from an illegal search or seizure is nonetheless admissible if

habeas relief is due to be denied regardless of the reasoning the state court used to reach that result. This is the way things were before the enactment of AEDPA, during the Brown v. Allen, 344 U.S. 443, 73 S. Ct. 397 (1953), de novo review regime. The AEDPA, of course, substantially limited the circumstances in which federal habeas relief can be granted. Miller-El v. Cockrell, 537 U.S. 322, 337, 123 S. Ct. 1029, 1039-40 (2003) ("Statutes such as AEDPA have placed more, rather than fewer, restrictions on the power of federal courts to grant writs of habeas corpus to state prisoners."); Gonzalez v. Sec'y for Dept. of Corr., 366 F.3d 1253, 1269 (11th Cir. 2004) (en banc) ("The central purpose behind the AEDPA was to ensure greater finality of state and federal court judgments in criminal cases."); Johnson v. United States, 340 F.3d 1219, 1224 (11th Cir. 2003) ("It is generally accepted that one of the principal functions of AEDPA was to ensure a greater degree of finality for convictions."). It necessarily follows that where we would deny relief under a de novo review standard, relief must also be denied under the much narrower AEDPA review standards. See Crawford v. Head, 311 F.3d 1288, 1324 (11th Cir. 2002).

20

"the information ultimately or inevitably would have been discovered by lawful means." Id. at 444, 104 S. Ct. at 2509. In Nix, for example, the Court held that evidence of the location and condition of the deceased victim's body was admissible, even though its discovery resulted from an illegal interrogation of the defendant, because extensive searches were underway in the area at the time and the body inevitably would have been discovered in substantially similar condition even without the interrogation of the defendant. Id. at 449-50, 104 S. Ct. at 2512.

The Supreme Court in Nix based the inevitable discovery exception on the policies underlying the exclusionary rule. As the Court explained, the "core rationale" of the exclusionary rule is to deter police misconduct by ensuring that the prosecution is not put in a better position than it would have been in if no illegality had transpired. Id. at 442-43, 104 S. Ct. at 2508-09. At the same time, the high social cost of allowing obviously guilty persons to go unpunished counsels against putting the prosecution in a worse position than it would have been in if the constitutional violation had not occurred. Id. at 443, 104 S. Ct. at 2508. When the evidence inevitably would have been discovered, the "public interest in having juries receive all probative evidence of a crime" outweighs the need to discourage police misconduct. Id. at 443-44, 104 S. Ct. at 2508-09. There is no additional deterrence value in suppressing the evidence in these

21

circumstances. Id. at 444, 104 S. Ct. at 2509. The exclusion of evidence would not restore the parties to their previous positions and would upset the careful weighing of competing interests underlying the exclusionary rule. Id.

Even before the Nix decision, the elements of the inevitable discovery rule were set forth in a former Fifth Circuit case, United States v. Brookins, 614 F.2d 1037 (5th Cir. 1980).[6] In order for evidence to qualify for admission under this exception to the exclusionary rule, there must be a reasonable probability that the evidence in question would have been discovered by lawful means, and the prosecution must demonstrate that the lawful means which made discovery inevitable were being actively pursued prior to the occurrence of the illegal conduct. Id. at 1042 n.2. Since the Nix decision, we have continued to follow the Brookins decision, which is entirely consistent with it. See United States v. Terzado-Madruga, 897 F.2d 1099, 1114 (11th Cir. 1990); United States v. Satterfield, 743 F.2d 827, 846 (11th Cir. 1984).

In Brookins itself the police obtained the identity of a key prosecution witness through an unconstitutional interrogation of the defendant. The Court found "[m]ore than a reasonable probability existed that normal police

_____

[6] Decisions of the Fifth Circuit rendered on or before September 30, 1981, are binding precedent in the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

22

investigation, if the interrogation had never occurred, would have disclosed the identity of [the witness]." 614 F.2d at 1048. The testimony of the witness was admissible because lawful police inquiries that were already "set in motion" probably would have disclosed his identity. Id.

Similarly, in Terzado-Madruga, the police obtained the identity of a prosecution witness by illegally taping a phone conversation between the defendant and another person. We held that the witness's identity was admissible, because even if it were unknown to the police at the time of the illegal taping, another conspiracy member who was capable of identifying the witness had voluntarily agreed to cooperate with police. 897 F.2d at 1114-15.

In this case, the evidence Jefferson speculates would have been suppressed by the trial court if his attorney had objected all flows from Greer's unequivocal identification of Jefferson's voice as that of the rapist. Because she heard his voice at the police station while he was being interviewed, Jefferson argues that the voice identification and all that followed was a product of his illegal stop. Before the stop, however, the police had information that had caused them to focus their attention on Jefferson.

The officers knew from the Mayos that Jefferson, who did not live in the area, had gotten his truck stuck four-tenths of a mile from the Greer residence

sometime before 5:25 a.m., which was within about three hours of Greer's rape. Jefferson's unexplained proximity to the scene of the crime in the early morning hours made him the prime suspect, or "person of interest" in the case. The officers wanted to talk with Jefferson, and they wanted to have Greer listen to his voice. They also had tire tracks from the ditch by the Mayos, and shoe prints from there and the Greer house where the rape had taken place, which they wanted to check out. The diligence with which the police were looking for Jefferson is shown by the fact that his car was pulled over at 10:00 p.m. that night by two police cars containing four officers.

In the absence of that allegedly improper stop, it is unfathomable that the investigators would not have availed themselves of the various ways in which they could have arranged for Greer to listen to Jefferson's voice. He was at the time a Staff Sergeant in the Army, hardly a position in which he could have remained mute throughout his work day. The officers could have had someone tape record him while he was talking. The tape could then have been played back for Greer. Or they could have called Jefferson on the telephone, either openly or through a ruse, and had Greer listen in to the conversation. Or they could have simply had Greer call Jefferson and listen to him talk. She would not have had to hear him say much in order to make the identification. We know that because

24

when Greer did hear Jefferson's voice at the police station, she immediately recognized it as that of her rapist, and she broke down emotionally, sobbing, gesturing, and shaking.

All the other evidence Jefferson contends should have been suppressed flowed from Greer's positive identification of him which, along with Jefferson's location near the scene of the rape in the early morning hours, supplied probable cause for his arrest. After Jefferson was arrested, he was photographed, and his photograph became part of an array, from which Christina Bacon, Shannon Tucker, and Sarah McCranie later identified him as the assailant in the other two rapes.

There is not simply a probability, but a virtual certainty, that if the officers had not stopped Jefferson that night, they inevitably would have discovered all the evidence that resulted from that stop. The efforts to locate Jefferson so that, among other things, Greer could hear him speak, were already under way and inevitably would have resulted in Greer identifying his voice as that of the rapist. Subtract the stop from the factual picture in this case and the most that would have changed is the timing of Greer's identification of Jefferson; it would have been delayed, which would have changed nothing of substance. Under these circumstances the inevitable discovery exception to the exclusionary rule applies,

25

and any suppression motion should have been denied. That means Jefferson suffered no prejudice from his trial counsel's failure to file a motion to suppress, and the ineffective assistance claim fails.

**III.**

We realize, of course, the possibility that a suppression motion would have been successful in the state courts. One might have been granted even though the Constitution does not require that it be. The state trial judge who presided at the Turner County trial made statements indicating he would have viewed a motion to suppress favorably. And the Georgia Court of Appeals did reverse the Irwin County convictions after deeming trial counsel ineffective for failing to file a suppression motion. On the other hand, the state habeas court denied Jefferson's identical claim in this case, and the Georgia Supreme Court denied review of its decision.

In any event, it changes nothing if we assume that the Georgia courts would have suppressed all the evidence flowing from the allegedly illegal stop if trial counsel had filed a motion to do so. We can go even further and assume that they would have done so and the result would have been an acquittal of Jefferson on these Turner County charges, just as he was acquitted when retried on the Irwin County charges. Even with these assumptions federal habeas relief is still

26

due to be denied, because as we have explained the inevitable discovery doctrine means that the granting of a motion to suppress would not have been warranted; granting the motion would have been the wrong result.

It might seem that if the state courts would have mistakenly granted the motion to suppress and changed the result of the trial, as we are assuming they would have, counsel's failure to file the motion prejudiced Jefferson. That reasoning, however, is directly contrary to the Supreme Court's decision in Lockhart v. Fretwell, 506 U.S. 364, 113 S. Ct. 838 (1993).

In Fretwell, as in the present case, if counsel had made an objection that the petitioner claims he should have, the state court would have taken an action favorable to the defendant, which would have actually changed the result of the trial. Fretwell, 506 U.S. at 366, 113 S. Ct. at 841. (There the objection would have resulted in the petitioner being ineligible for a death sentence, id. at 368, 113 S. Ct. at 842; here we are assuming the objection would have resulted in the suppression of enough of the damaging evidence against Jefferson that he would have been acquitted on retrial.) In Fretwell, as in the present case, if counsel had objected the state court would have taken the result-changing action favorable to the petitioner based on the erroneous belief that the federal Constitution required it to do so. Id. at 371-72, 113 S. Ct. at 843-44. In Fretwell, as in the present case,

the petitioner argued that the fact a different result would have occurred had counsel objected in state court means that the <u>Strickland</u> prejudice requirement is satisfied. <u>Id.</u> at 367, 113 S. Ct. at 841. That argument has a lot of surface appeal, but the Supreme Court went beyond the surface of it in <u>Fretwell</u> and in obedience to that decision so must we.

As the Supreme Court explained in its <u>Fretwell</u> opinion, the critical focus of the <u>Strickland</u> prejudice inquiry is not results per se, but the fairness and reliability of the adversary proceeding in question. 506 U.S. at 369-71, 113 S. Ct. at 842-43. If the proceeding was fair and the result is reliable, it is immaterial for purposes of the prejudice inquiry whether counsel could have done something that would have brought about a different result. Or, as the Court explained it: "[A]n analysis focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective. To set aside a conviction or sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him." <u>Id.</u> at 369-70, 113 S. Ct. at 842-43 (internal marks and citations omitted); <u>see also</u>, <u>Brady v. Maryland</u>, 373 U.S. 83, 90, 83 S. Ct. 1194, 1198 (1963) (rejecting a "sporting theory of justice" in regard to the prejudice component of <u>Brady</u> claims).

When a federal habeas court is deciding whether to grant a state prisoner relief on ineffective assistance of counsel claims, fairness and reliability are defined in terms of what the Constitution requires, not in terms of what the petitioner might have gained from the state courts under an erroneous view of federal constitutional law. The Supreme Court put it nicely when it said that in evaluating prejudice a court should not consider an error by counsel that merely "deprived [the defendant] of the chance to have the state court make an error in his favor." Fretwell, 506 U.S. at 371, 113 S. Ct. at 843.

Jefferson, like Fretwell, was not entitled to have his counsel present the state courts with an opportunity to make an error in his favor. The objection Jefferson insists his counsel ought to have made, like the one Fretwell insisted his counsel ought to have made, should have been denied. Jefferson, like Fretwell, is not entitled to a windfall. Jefferson was not prejudiced in the sense required by Strickland, just as Fretwell was not. We must reject Jefferson's ineffective assistance of counsel claim just as the Supreme Court rejected Fretwell's.

The decision of the district court is REVERSED.