[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-12098
Non-Argument Calendar
_____

D.C. Docket No. 1:14-cr-00009-WLS-TQL-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

WILLIAM C. HARRIS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Georgia
_____

(December 29, 2015)

Before HULL, JORDAN, and JULIE CARNES, Circuit Judges.

PER CURIAM:

William Harris appeals his conviction and 26-month sentence for possession

of a firearm by a convicted felon, pursuant to 18 U.S.C. §§ 922(g)(1) and

924(a)(2).  Harris contends that the district court erred by denying his motion to suppress the guns found inside his residence and a safe therein following a warrantless search.  After careful review, we affirm.

## I.  BACKGROUND

### A.    Harris's Probationary Sentence

In 2006, Harris pled guilty to attempted burglary in Georgia state court.  He received a two-year custodial sentence followed by eight years' probation.  One of the conditions of Harris's probation was that he "[s]hall, at the request of Probation Supervisor, consent to a search, without necessity or benefit of a search warrant, of person, residence, or motor vehicle under [his] control by Probation Supervisor or any Law Enforcement Officer for detection of alcohol or controlled substances."

### B.    Indictment for Firearms Offense and Motion to Suppress

Harris was serving his probationary sentence on April 9, 2012, when a probation officer and Georgia Bureau of Investigation ("GBI") agents searched his residence.  The law enforcement officials discovered 12 firearms.  In March 2014, the government indicted Harris for possession of a firearm by a convicted felon.[1]

Harris filed a motion to suppress his statements and the firearms discovered at his residence.  Harris claimed that the officers violated his Fourth Amendment rights for multiple reasons, including that: (1) there was no reasonable suspicion to

---

[1] The government waited two years to indict Harris because Harris was imprisoned for a probation violation until March 2014 as a result of the events described in this opinion.

search his residence for controlled substances; (2) the terms of his probation allowed searches for the detection of controlled substances, not firearms, and the law enforcement officials did not have reasonable suspicion to believe that there were controlled substances within a gun safe; and (3) a GBI agent made statements that contradicted his Miranda[2] warnings, and it was only after this point that he divulged the gun safe's combination and opened it.

## C.    Evidence Related to April 9, 2012 Search

Harris submitted an affidavit in support of his motion. The district court held a suppression hearing at which two law enforcement agents testified. According to the evidence adduced at the hearing and from the affidavit,[3] agents began investigating Harris when the post office contacted the GBI in reference to a package that broke during transportation. The package contained a hydroponic light that could be used to grow marijuana. An undamaged second package bearing the same address contained a liquid substance, which Harris later asserted was plant nutrients.

GBI agents matched the address on the packages to the residence in which Harris was living. They discovered through a records search that Harris was on

---

[2] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).

[3] We include material from Harris's affidavit in order to provide a complete account of the search. We do not rely on any statements from the affidavit, that were not corroborated during the suppression hearing, in our analysis. The government objected to the affidavit being considered because it did not have the opportunity to cross-examine Harris. The district court never addressed the objection and the government does not raise the objection again on appeal.

3

probation and had prior charges for drug violations, including possession of marijuana with intent to distribute.  The agents confirmed with Harris's supervising probation officer that Harris had a "search clause" in his conditions of supervision.

On April 9, 2012, Agent Stripling Luke and other GBI agents observed a postal employee deliver the packages to Harris's residence and hand the packages to Harris.  The residence belonged to Harris's father, and Harris was living in the pool house.  After Harris took possession of the packages, he placed the plant nutrients in a greenhouse on the property and returned to the pool house.  When his dog began barking, he walked back to the front of the property where Agent Luke, a probation officer, and approximately three other agents were standing in the driveway.

The probation officer asked why Harris had failed to report to his probation officer.  Harris replied that he was only one day late and was to be placed on "non-reporting status."  A GBI agent then asked Harris what use he had for a hydroponic light, and Harris responded that he was building his stepmother a hydroponic system in the greenhouse.  The agent asked if he could see the greenhouse, and the probation officer interjected to say that, due to Harris's probationary status, the agents had a right to search the residence.  After searching the greenhouse, the agents told Harris that they were going to search the rest of the property and asked

4

Harris whether there was anything on the property they should know about. Harris admitted that there was a marijuana plant in the pool house and then accompanied the agents to the pool house.

Harris had a marijuana plant with a fluorescent light over it, two ballasts, two light reflectors, nutrients, and rock wool hidden in a closet in the pool house. Luke described this closet setup as a "grow room." One of the agents observed a gun safe in the pool house and asked Harris what was inside and whether he had the combination. Harris said he did not know what was inside, and only his father and brother knew the combination. The agents continued to press him about the contents of the safe until he stated that he was "pretty sure" there were guns inside.

At some point, Agent Luke questioned Harris about how the marijuana grow equipment worked. Harris asked Agent Luke whether his statements were "off the record," and Agent Luke stated, "Yes." With this understanding, Harris "talked for some time." In his affidavit, Harris indicated that he would not have continued talking had he understood that the statements could be used against him in a federal prosecution.

Agent Jeff Reed, of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), arrived on the scene about an hour after the other law enforcement personnel. Agent Reed questioned Harris about the gun safe and the guns that were inside and repeatedly asked for the safe's combination. According

to Harris, Agent Reed became belligerent and stated: "We're not leaving here until we get into that safe," and, "We are going to get into this safe if we have to cut the . . . door off!" At this point, Harris decided to provide the combination and open the safe. The agents found guns inside.

The agents also found a gun in a dresser or set of drawers in the pool house. Harris stated that the agents did not find that gun until after they had opened the safe. The master report of the incident allegedly stated the same. However, both Agent Luke and Agent Reed testified that they discovered the gun before opening the safe.

Throughout the search, the GBI agents maintained a recording device to capture Harris's statements. Agent Luke, however, deactivated the device for a period of time when he was processing evidence rather than speaking to Harris. He turned it back on when he needed to consult with Harris again.

The government played the recording for the district court. The tape confirmed that the agents questioned Harris about his failure to report to probation. Harris admitted that he had failed to report, citing a number of reasons, and admitted that he had a marijuana plant. A female agent also read Harris his Miranda rights. Later, Agent Luke told Harris that their conversation was off the record. The recording contained no mention of the handgun that was found in the drawer. The tape established that Agent Reed told Harris twice that he did not

6

want to cut the safe open and once that he was planning to cut it open if he could not get the combination.

The agents also took photographs of what they discovered at the scene. The photograph of the firearm from Harris's drawer was timestamped 2:02 p.m., and the photograph of the items in the safe was timestamped 2:50 p.m.

Agent Luke testified that (1) items related to the hydroponic manufacture of marijuana could have fit in the safe; (2) he was not sure what was in the safe; and (3) he felt that the search terms in Harris's conditions of probation allowed him to access the safe. In the past, he had found drugs, currency, and ledgers in similar safes and believed that Harris could have had anything inside. No one repeated the Miranda rights to Harris after the off-the-record comments.

Agent Reed testified that, when he arrived at Harris's home, agents briefed him on the discovery of the hydroponic system and showed him the marijuana grow area in Harris's closet. The agents also pointed out a revolver that they had discovered and placed on a table in the pool house. Agent Reed began questioning Harris and, at some point, Harris indicated that he had placed guns in the safe. This prompted Reed to ask Harris directly for the combination to the safe. Harris eventually opened the safe and gave the agents the combination. Agent Reed did not advise Harris of his Miranda rights.

Agent Reed further testified that he believed that he would have had the authority to cut the safe open if Harris had not unlocked it and he intended to do so. In Reed's experience, such safes could contain drugs, ledgers, "growing books," guns, or "anything of that nature." Having already found marijuana and one firearm, Reed believed there was reason to suspect that there was additional contraband in the safe.

## D.    District Court's Ruling on Motion to Suppress

The district court granted Harris's motion to suppress in part and denied it in part. The court concluded that all of Harris's statements, made after the time that Agent Luke agreed to talk off the record, had to be suppressed. The court reasoned that Agent Luke's comments contradicted the <u>Miranda</u> warnings such that Harris's statements were involuntary. There is no challenge to this ruling on appeal.

As to the firearms, the court resolved the factual dispute concerning the discovery of the revolver by finding that the agents discovered the gun before any unlawful interrogation and before Agent Reed arrived at the residence and convinced Harris to open the safe. Furthermore, even though the safe was opened after the unlawful interrogation, the court stated that the firearms contained in the safe were admissible under the inevitable discovery doctrine, as the agents would have, and lawfully could have, broken open the safe, had Harris not opened it. The district court also noted that the fruits of the search were lawful because the law

8

enforcement officers had reasonable suspicion to search Harris's residence for controlled substances.

### E.    Guilty Plea, Sentence, and Appeal

After he was unable to exclude the firearms from evidence, Harris pled guilty to possession of a firearm by a convicted felon, pursuant to a written plea agreement. Harris reserved his right to appeal the district court's order denying his motion to suppress. The district court then sentenced Harris to serve a 26-month prison term.

Harris appealed. He claims that the search of his residence was unconstitutional because (1) the agents lacked reasonable suspicion to initiate the search and circumvented the Fourth Amendment, and (2) the inevitable discovery exception to the exclusionary rule was inapplicable.

## II.  REASONABLE SUSPICION

### A.    Standard of Review

When reviewing the denial of a motion to suppress, this Court reviews the district court's findings of fact for clear error and its application of law to those facts de novo. United States v. Gibson, 708 F.3d 1256, 1274 (11th Cir. 2013). All facts are construed in the light most favorable to the prevailing party below–here, the government. Id.

**B.    Reasonable Suspicion Principles**

Normally, law enforcement officers need a warrant supported by probable cause to search a suspect's home.  Griffin v. Wisconsin, 483 U.S. 868, 873, 107 S. Ct. 3164, 3168 (1987).  However, there are exceptions to this requirement, including an exception for "special needs."  Id.  The Supreme Court has held that a state's operation of a probation system creates the type of "special needs" that "justify departures from the usual warrant and probable-cause requirements."  Id. at 873-74, 107 S. Ct. at 3168.  The state has an interest in supervising probationers, id. at 874-75, 107 S. Ct. at 3168-69, and probationers have a reduced expectation of privacy, United States v. Knights, 534 U.S. 112, 119-21, 122 S. Ct. 587, 591-93 (2001).

Balancing these interests and expectations, the Supreme Court has concluded that officers need "no more than reasonable suspicion to conduct a search of [a] probationer's house" when the probationer is subject to a search condition.  Knights, 534 U.S. at 121, 122 S. Ct. at 592-93.  As probable cause is not necessary, it also follows that a warrant is not required.  Id. at 121, 122 S. Ct. at 593.

A search rests on reasonable suspicion when there is a "sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable."  Id.  Based on the totality of the

10

circumstances, law enforcement must have "a particularized and objective basis for suspecting legal wrongdoing." United States v. Yuknavich, 419 F.3d 1302, 1311 (11th Cir. 2005) (quotation marks omitted).  The officers must "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Id. (quotation marks omitted).  A "hunch" or "unparticularized suspicion" is insufficient. Id. (quotation marks omitted).

## C.    Analysis

Here, the government did not violate Harris's Fourth Amendment rights by searching his residence.  Harris had a search clause in his conditions of probation that authorized a probation supervisor or law enforcement officer to search his residence for controlled substances.  When the GBI agents and parole officer staked out Harris's home, they knew that Harris had ordered hydroponic equipment, that such hydroponic equipment, while legal, was commonly used to grow marijuana, that Harris had a prior marijuana-related charge, and that Harris had recently failed to report to his probation officer.  Before initiating the search, the officials also confirmed that Harris accepted delivery of the hydroponic equipment.

Based on these observations, the law enforcement officers had "specific and articulable" facts that gave them reasonable suspicion that Harris was in possession

11

of marijuana.  See id.  Taking together his criminal background, his acquisition of

an item related to marijuana production, and that he recently failed to report to his

probation officer, there was a sufficiently high probability that Harris unlawfully

possessed a controlled substance to justify searching his private residence pursuant

to the controlled-substance search condition.  See Knights, 534 U.S. at 120-21, 122

S. Ct. at 592-93 (stating that a "probationer is more likely than the ordinary citizen

to violate the law" and has "even more of an incentive to conceal [his] criminal

activities" (quotation marks omitted)).  This was much more than a hunch that

criminal activity was afoot and satisfied the reasonable suspicion standard.  See

Yuknavich, 419 F.3d at 1311.

This Court has upheld warrantless probationary searches based on

comparable or less direct evidence than this in the past.  For example, in United

States v. Carter, 566 F.3d 970, 975 (11th Cir. 2009), this Court concluded that

probationer Carter's record of drug crimes, extravagant lifestyle despite having

little income, association with another drug offender, and creation of business

cards that featured what appeared to be a gang symbol, taken together, created

reasonable suspicion to search his residence.

Similarly, in Yuknavich, 419 F.3d at 1304, the probationer was convicted of

a child-pornography offense and as a condition of his probation he was not allowed

to use the Internet, except for work during work hours.  This Court determined that

12

probation officers had reasonable suspicion to search a computer in probationer Yuknavich's residence due to his criminal history, pattern of pushing or crossing the boundaries of permissible behavior while on probation, including impermissibly accessing the Internet <u>outside</u> of his home on two occasions, nervous appearance and delay in answering the door, and the fact that there was a modem connected to one of his computer.  <u>Yuknavich</u>, 419 F.3d at 1306-07, 1311.

Here, the district court did not err by denying suppression in the instant case, when Harris was already known to be in possession of marijuana-related equipment by the time of the search.

### III.  "STALKING HORSE"

**A.    Argument**

For the first time on appeal, Harris argues that the government used the search provision in his terms of probation to circumvent the Fourth Amendment. He claims that the search of his residence had a law-enforcement, rather than probationary, purpose.  Harris asserts that it is unconstitutional for a probation officer to act as a "stalking horse" by conducting a search based on the prior request of, and in concert with, law enforcement officers, in an effort to allow the law enforcement officers to evade the usual warrant and probable-cause requirements.

**B.    Standard of Review**

We review issues not raised in the district court for plain error.  United States v. Aguillard, 217 F.3d 1319, 1320 (11th Cir. 2000).  For this Court to correct plain error, (1) there must be an error (2) that is plain and (3) affects substantial rights.  Id.  "Where the explicit language of a statute or rule does not specifically resolve an issue, there can be no plain error where there is no precedent from the Supreme Court or this Court directly resolving it."  United States v. Hesser, 800 F.3d 1310, 1325 (11th Cir. 2015) (alteration omitted) (quotation marks omitted).

**C.    Analysis**

Harris has shown no plain error.  This Court has never recognized the "stalking horse" theory, nor has the Supreme Court.  Harris cites only extra-circuit precedent in support of his argument.  Moreover, many circuits have overruled their "stalking horse" decisions after the Supreme Court's decision in Knights, which suggested that it is impermissible to examine the purpose of a probationary search.  See United States v. Williams, 417 F.3d 373, 377-78 (3d Cir. 2005) (stating that the Third Circuit was joining the Eighth, Ninth, and Tenth Circuits in holding that "stalking horse" claims are precluded by Knights); see also Knights, 534 U.S. at 122, 122 S. Ct. at 593 (clarifying that "there is no basis for examining official purpose" and that the Supreme Court has "been unwilling to entertain

14

Fourth Amendment challenges based on the actual motivations of individual officers").

In any event, as there is no binding precedent controlling Harris's claim, the district court did not plainly err by failing to suppress the guns based on a "threshold" "stalking horse issue." See Hesser, 800 F.3d at 1325.

## IV. INEVITABLE DISCOVERY RULE

In order for evidence otherwise subject to suppression to be admissible under the inevitable discovery rule, "there must be a reasonable probability that the evidence in question would have been discovered by lawful means, and the prosecution must demonstrate that the lawful means which made discovery inevitable were being actively pursued prior to the occurrence of the illegal conduct." Jefferson v. Fountain, 382 F.3d 1286, 1296 (11th Cir. 2004). Thus, there are three requirements for application of the inevitable discovery exception: (1) the evidence's discovery was inevitable, (2) by lawful means, and (3) the government was already actively pursuing the lawful alternative method of discovery. See id. We examine each requirement in turn as applied to the firearms discovered in Harris's safe.[4]

---

[4] Our review is de novo. See Gibson, 708 F.3d at 1274.

15

### A.    Inevitability

During the evidentiary hearing, Agent Reed testified that he intended to cut into the safe if he could not obtain the combination and believed that he had the authority to do so.  Agent Luke also stated that he felt that the search clause gave the officers the ability to force open the safe.  Based on these statements, there was a reasonable probability that Agent Reed and the GBI agents would have broken into the safe had Harris not opened it after the illegal interrogation.  See id. Moreover, there was no indication that Harris's family members were home during the search, and there was nothing suggesting that the agents were planning to leave Harris alone with the safe.  Therefore, the guns would still have been inside the safe when the officers broke the lock.  The discovery of the guns was inevitable. See id.

### B.    Lawful Means

The inquiry now turns to whether it would have been lawful for the agents to break into the safe without a warrant.  As we stated above, police can search a probationer's residence based on reasonable suspicion.  See Knights, 534 U.S. at 121, 122 S. Ct. at 592-93.  When police are lawfully searching an area, they are authorized "to break open locked containers which may contain the objects of the search."  United States v. Martinez, 949 F.2d 1117, 1120 (11th Cir. 1992).

16

As outlined above, the agents had reasonable suspicion to search Harris's pool house for controlled substances. In addition, the degree of suspicion drastically increased during the time period between the start of the search and Agent Reed's arrival. During that time, Harris admitted that he had a marijuana plant and agents found a marijuana grow station in his closest and a firearm in his drawer.

Furthermore, both Agent Reed and Agent Luke testified that the safe could contain drugs. Agent Luke stated that items related to the hydroponic manufacture of marijuana could have fit in the safe and that, in the past, he had found drugs inside similar safes. Agent Reed added that, in his experience as well, such safes could contain drugs. Indeed, the safe was about five feet tall and easily could have stored a quantity of marijuana.

Accordingly, as there was reasonable suspicion to search Harris's pool house for controlled substances, and the safe was inside the pool house and drugs could easily fit in the safe, the agents had the authority to break open the safe to access its contents. See id. As the district court properly found, the officers had a lawful alternate method of opening the safe.

## C.    Active Pursuit of Alternate Means of Discovery

The district court was also correct in concluding that the government met the final prong of the inevitable discovery rule. The agents were already in the same

17

room as the safe, and it is clear from Agent Reed's testimony that he only delayed breaking into the safe in the hope that Harris would divulge the combination. Thus, efforts to access the safe lawfully were sufficiently underway by the time that Harris opened the safe as a result of the unlawful portion of his interrogation. See Jefferson, 382 F.3d at 1296; cf. United States v. Brookins, 614 F.2d 1037, 1048 (5th Cir. 1980) (holding that police are sufficiently "actively pursuing" evidence in a witness's possession when they have evidence that would have led to the witness's discovery had the witness not first been discovered through unlawful means).[5]

The government met its burden under the inevitable discovery rule, and the district court did not err by denying Harris's motion to suppress, so far as he sought exclusion of the physical evidence discovered at his residence. See Jefferson, 382 F.3d at 1296. Accordingly, for all of the foregoing reasons, we affirm the district court's denial of Harris's motion to suppress as to the firearms and affirm Harris's conviction and sentence.[6]

**AFFIRMED.**

---

[5] This Court has adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[6] Harris's reply brief argues that the involvement of the ATF and Agent Reed were outside the scope of the search condition, and that the GBI agents unlawfully prolonged the search so that Agent Reed could arrive and participate. However, this Court does not review claims raised for the first time in the reply brief and thus will not address these final arguments. See United States v. Dicter, 198 F.3d 1284, 1289 (11th Cir. 1999).

18