[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-14336
_____

D.C. Docket No. 9:17-cr-80222-KAM-2

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

LATECIA WATKINS,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(December 3, 2020)

Before LUCK, ED CARNES, and MARCUS, Circuit Judges.

ED CARNES, Circuit Judge:

The Postal Service is as old as the United States, and during the past two-and-a-half centuries more than a million Americans have honorably served this

country through it. Among the more notable ones are Benjamin Franklin who was the first Postmaster General, and Abraham Lincoln who as a young man was postmaster in the village of New Salem, Illinois. Franklin and Lincoln did not betray the trust placed in them. The same cannot be said of Latecia Watkins.

Watkins was a supervisor at the Boca Raton, Florida Post Office until her arrest in 2017 on charges stemming from the importation of more than five kilograms of cocaine into the United States with the intent to distribute it. She was caught red-handed and voluntarily confessed, but she convinced the district court to suppress the evidence of her guilt on Fourth Amendment grounds. This is the government's interlocutory appeal from the district court's suppression order and its order denying a motion for reconsideration.

## I.    FACTS

Two packages were sent into this country from Trinidad and Tobago. Both had cocaine hidden inside. And both were oddly addressed. One was addressed to "Margaret Simpson" at the Boca Raton Post Office, but with no post office box number. The other was addressed to "Jason Stanley" at a UPS Store that was a couple of hundred feet from the Boca Raton Post Office, but there was no box number included in that address either. The absence of box numbers was notable because neither a post office nor a UPS store accepts packages addressed for delivery there unless the addressee rents a box at that location.

2

At the international mail facility, after finding cocaine hidden in the two packages, law enforcement agents had removed the drugs from them, placed a GPS tracking device and sham cocaine into each package, and then put both packages into the mail stream, headed to their original destinations.

The agents monitored the packages' locations using both the inserted tracking devices and the Postal Service's internal tracking system, which is routinely used on all packages. They also set up surveillance of the Boca Raton Post Office on the morning of August 11, 2017, when they expected the packages to be delivered. But that morning the GPS tracking devices the agents had put into both packages unexpectedly stopped working. That happened around 9:42 a.m.

Unlike the GPS tracking devices used by law enforcement, the Postal Service's routine package tracking system does not continuously pinpoint a package's location as it moves or is stationary. Instead, it uses scans of a package's unique tracking number to show the history of its journey: where the package came into the postal system, some of the stops along the way, and where it was finally delivered. The package is scanned at each stage, and unless it is tampered with, the tracking system automatically updates to the database the location, date, and time a package is manually scanned as it proceeds through the postal system to delivery.

3

A few of the codes that are routinely entered as a package is scanned while it proceeds along the way are important here.  One of them is the code that occurs when a package is scanned as it comes into a post office en route to its final destination; the resulting code shows when the package arrived at the post office. Another code results from the scanning that occurs when the package is delivered to its intended address.  That final code records the delivery time.

One wrinkle is that if a package is addressed to a post office box but is too large to fit into that box, it is scanned into the tracking system with the code: "Scanned Notice Left."  That means the postal carrier left a notice slip in the recipient's post office box, which she can take to the counter to exchange for her package.

As for the two packages involved in this case, law enforcement agents could tell from the codes produced by the routine postal tracking system that both packages had been on a journey that was not routine.  The package addressed to Jason Stanley was reported by the postal tracking system to have arrived (having been scanned in) at the post office at 8:33 a.m. that morning.  The system also reported that the package had then been delivered to the UPS store near the post office at 11:06 a.m.  But when the agents called the UPS store, they learned that no one named "Jason Stanley" rented a box there, and that no package addressed to that name had been delivered to the store.

The package tracking system also told an odd tale about the package addressed to Margaret Simpson. According to the system, that package had been delivered to the Boca Raton Post Office at 11:06 a.m. that same morning. But, as we've mentioned, there was no post office box number in the address on the package, no one named "Margaret Simpson" rented a post office box there, and without a rented box generally no one could receive mail or a package at that post office. Not only that, but even though the package was too large to fit into a post office box, it had not been scanned as "Scanned Notice Left." And neither of the two packages of (sham) cocaine was anywhere to be seen.

How could all of this be? To the agents all signs pointed to an inside job. A postal employee had to have been helping sneak the packages through the mail system, leaving only a few otherwise inexplicable traces. And the culprit most likely was not just any postal employee. The agents knew that a supervisor would have had what one agent called "unique access to certain aspects" of the scanning system. That unique access would allow a supervisor to scan the two packages in ways that indicated they had arrived and been delivered at times and places they had not been. From the facts they knew, the agents deduced that a supervisor had known that the packages would be arriving, had manipulated their scan history once they did arrive, and had taken the packages.

5

One postal worker stood out as a suspect: Latecia Watkins.  She was a supervisor, which was important.  She also had "some issues with the postal service," and one of the agents believed that "her character fit this" crime.  Because of their suspicions, the agents looked up Watkins in one of their databases and obtained her driver's license information and home address.

The agents' suspicion of Watkins grew throughout the day that the packages were delivered.  At one point that day, two of the agents entered the post office to see if they could find the packages.  As they were entering, they encountered Watkins.  Her response to seeing them, one of whom she knew to be a postal inspector, was dramatic.  Even before they had spoken a word to her she appeared anxious, nervous, and scared — so much so that her knees buckled and she looked like she was going to faint.  When they asked Watkins if she was okay or if anything was wrong, she just stared at them.  Only after the agents told her that they were there to get some documents (which was a ruse) did she finally calm down.  Watkins' extreme reaction to seeing them deepened the agents' suspicions that she was involved in smuggling the drugs.

The agents maintained surveillance at the post office until it closed at 6:30 p.m. that same day.  As the supervisor in charge of closing the office that night, Watkins was the last employee to leave.  No agent followed her or otherwise attempted to surveil her.  With the post office closed, the agents decided to enter

6

and search for the packages because they had not noticed anyone leave there with the packages during the day. They expected their search of the post office to take a couple of hours.

As the agents searched the post office, they did not have a fixed plan for what they would do if they did not find the packages there. But, later in testimony that the magistrate judge credited, the agents stated that their next step "probably" would have been to conduct a knock and talk at Watkins' house, which was located at an address they had already looked up before the tracking device unexpectedly came back to life. The agents would have done a knock and talk anyway because she was their "prime suspect" and, in fact, their only suspect. They did not have "any other leads."

As one agent testified, a knock and talk at Watkins' house "was the plan being discussed," and "that was the plan [they] had begun to formulate" and were in the process of formulating when the tracking device began to function again. They had felt pressure to "act[] quickly" because "it would have been exponentially harder to locate the packages" had they not. One of the agents testified that if the device had not come back on they would have done the knock and talk that night anyway after searching the post office instead of waiting until the next day to do it.

7

But, as we have mentioned, while the search at the post office continued and the agents were discussing their next step, one of the two tracking devices unexpectedly began working again at 8:29 p.m. (Both devices had gone silent nearly eleven hours earlier, around 9:42 a.m. that morning.) The device indicated that it was in a location that the agents immediately recognized as the area where Watkins lived, and they used a Google search to confirm that the device was at her house. At that point, they stopped searching the post office and went immediately to Watkins' house.

At least six law enforcement agents drove there in unmarked vehicles. At least five of the agents approached the front of Watkins' house and three of those five approached her front door wearing tactical vests over civilian clothes. They arrived at the door at around 9:08 p.m.

One of the agents knocked on Watkins' door in a "normal" way, without pounding on it. Before the door opened, at least one of the three agents at the door could smell marijuana, and after Watkins opened the door all three of them could smell marijuana coming from inside the house. At that point, Agent Rivera identified herself as a law enforcement officer and calmly asked Watkins, "Do you know why we are here[?]" In response, Watkins "just put her head down" and answered either, "Yes, the boxes," or, "The packages."

8

Agent Rivera then asked Watkins to step outside the house so they could talk. She did so. They walked to the end of the driveway, and Agent Rivera asked her, "You know why we [are] here about the boxes." Again, Watkins said "yes." Then Agent Rivera asked her, "Can I take a look at the boxes? Can you show me wh[ere] they are?" At that point, Watkins turned and, without saying anything, began walking back to her house. Though Watkins had not expressly said so, Agent Rivera interpreted her actions as consent to follow her into the house.

Before they actually went into the house, two other agents stopped them so a security sweep could be completed inside the house. The sweep was in response to the smell of marijuana and the agents' concern that the evidence of the marijuana might be destroyed. The agents also planned to apply for a search warrant based on that smell, and one of them did get a warrant after the sweep, but no additional evidence relevant to this case was located through the warrant. During the sweep, which took only a few minutes, the agents found marijuana in plain view. They also saw in plain view two packages lying on the floor in Watkins' bedroom, which they recognized as being the ones with the fake drugs in them.

Once the security sweep was done, Agent Rivera followed Watkins to her bedroom where the packages were. Watkins, who was not in handcuffs, signed written Garrity and Miranda waiver forms, consented to a search of her cellphone, and in a recorded interview made several incriminating statements. See Garrity v.

9

New Jersey, 385 U.S. 493 (1967); Miranda v. Arizona, 384 U.S. 436 (1966).

Watkins explained to the agents how she had met her co-defendant, as well as their

scheme for him to mail drugs into the country and for her to use her position to get

the drugs through the post office without detection.  Watkins also told the agents

that her co-defendant's telephone was going straight to voicemail when she called

it, that she had no other way to get in touch with him, and that she thought he had

already been arrested.

## II.    PROCEDURAL HISTORY

Watkins was charged with four crimes.[1]  She moved to suppress "all

physical evidence and statements obtained as a result of law enforcement's

warrantless installation of and surveillance using tracking devices hidden inside

two postal packages."

### A. The Magistrate Judge's Report and Recommendation

Watkins' motion to suppress was referred to Magistrate Judge William

Matthewman.  He held an evidentiary hearing, which included four government

witnesses, three of whom were law enforcement agents who had been involved in

---

[1] Those charges were:  Conspiracy to import five kilograms or more of cocaine into the United States, in violation of 21 U.S.C. §§ 963, 952(a), and 960(b)(1)(B) (Count 1); importation of five kilograms or more of cocaine into the United States, in violation of 21 U.S.C. §§ 952(a) and 960(b)(1)(B) (Count 2); conspiracy to possess five kilograms or more of cocaine with the intent to distribute, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A) (Count 3); and attempted possession of five kilograms or more of cocaine with attempt to distribute, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A) (Count 4).

the search of the post office and the knock and talk at Watkins' house. Watkins called two of her own witnesses; they had been with her in the house when the law enforcement agents arrived.

The judge issued a report recommending that Watkins' motion be denied. In it, he expressly and repeatedly found that the testimony of the law enforcement agents was credible in all respects. He also found that Watkins' witnesses were not credible.

The report gave several reasons for recommending denial of the motion to suppress. It said that the initial search and seizure of the two packages was lawful, and that the monitoring of the one tracking device that was functioning inside Watkins' house was also lawful. In the alternative, the report concluded that even without the reactivated tracking device, law enforcement had reasonable suspicion to do a knock and talk at Watkins' house that night, and that they would have gone to her house to do it anyway. According to the report, Watkins consented to the agents entering her home, and her consent and all of her incriminating statements were voluntary. Finally, it concluded that after Watkins opened the door, probable cause and exigent circumstances justified a security sweep of the house because of the marijuana smell and concerns about the destruction of evidence as well as for the safety of the agents.

11

B.  The District Court's Orders

Watkins objected to the magistrate judge's report and recommendation. Without conducting a new evidentiary hearing, the district court issued an order sustaining Watkins' objections and granting her motion to suppress. The court agreed with the magistrate judge that the initial search and placement of the tracking devices by the government was lawful. But relying on the Supreme Court's Karo and Jones decisions, the court concluded that the government had to have a warrant to monitor the tracking device inside Watkins' house because it was no longer open to visual surveillance from a public place and Watkins had a justified privacy interest in her house. See United States v. Jones, 565 U.S. 400 (2012); United States v. Karo, 468 U.S. 705 (1984). Because the agents did not have a warrant at that time, the court concluded that Watkins' Fourth Amendment rights were violated by the government's warrantless monitoring of the tracking device when it reactivated and showed them that the packages were in her house.

The district court also ruled that, even though Watkins' consent to the search of her home was voluntary, it was tainted because it was the product of the unlawful monitoring of the tracking device and, for that reason, the attenuation exception to the exclusionary rule did not apply. The court acknowledged that the magistrate judge had "found that even without the tracking of the box, law enforcement would have conducted a 'knock and announce.'" But the court

12

viewed that finding as irrelevant "in view of the fact that law enforcement did, in fact, track the box with the monitoring device which led them to [Watkins'] residence."

The government filed a motion for reconsideration of the district court's order, contending that the inevitable discovery exception made the evidence admissible. It noted that the court had declined to consider the inevitability of the discovery based on the court's finding that law enforcement had illegally tracked one of the packages. But, as the government pointed out, "analysis under the inevitable discovery doctrine presupposes an illegal search did, in fact, occur, [and] considers whether there is a reasonable probability that the evidence would otherwise have been discovered by lawful means." It argued that the suppressed evidence would inevitably have been discovered because, even before the tracking device came back to life, Watkins was the sole suspect and the agents had already searched for and found her address; and the agents testified that going to Watkins' house that same night to do a knock and talk was probably the next step in their investigation. They had no other leads.

The district court denied the motion to reconsider. First, the court stated that it was "purely speculative to conclude" that law enforcement agents would have gone to Watkins' house after they completed their search at the post office, and that it was "purely speculative to conclude" Watkins would have responded in the

13

same way if they had approached her house "at a different time and under different circumstances." Second, the court ruled that the inevitable discovery exception did not apply because it found that although the lawful means of obtaining the evidence — the knock and talk — was being considered, it "was not actually being pursued when the unlawful tracking occurred, and law enforcement abandoned their search of the post office to approach" Watkins' house.

## III.    ANALYSIS

In its brief to this Court, the government concedes that law enforcement violated Watkins' Fourth Amendment rights by the warrantless monitoring of the tracking device once it reactivated inside Watkins' house. We are not bound to accept that concession, see Roberts v. Galen of Va., Inc., 525 U.S. 249, 253 (1999), but for purposes of this case we will assume that the warrantless monitoring of the signal from the package once it entered the house was a violation of the Fourth Amendment. We can make that assumption because it does not affect the bottom line of our decision.

### A. The Exclusionary Rule and the Inevitable Discovery Exception

A Fourth Amendment violation can trigger the exclusionary rule, which requires courts to suppress illegally obtained evidence, but that rule has several exceptions. Exceptions exist because the exclusionary rule "has always been our last resort, not our first impulse." Utah v. Strieff, 136 S. Ct. 2056, 2061 (2016)

14

(quotation marks omitted).  We are not quick to "indiscriminate[ly] appl[y]" the rule because it "generates substantial social costs, which sometimes include setting the guilty free and the dangerous at large" and which take a "costly toll upon truth-seeking and law enforcement objectives."  United States v. Delancy, 502 F.3d 1297, 1314 (11th Cir. 2007) (quoting Hudson v. Michigan, 547 U.S. 586, 591 (2006)).  Instead, we reserve the exclusionary rule "'only [for] where its remedial objectives are thought most efficaciously served — that is, where its deterrence benefits outweigh its substantial social costs.'"  Id. (quoting Hudson, 547 U.S. at 591).  And to justify application of the rule those deterrence benefits cannot be merely incremental, marginal, or simply possible; they must be substantial and must actually outweigh the costs.  Herring v. United States, 555 U.S. 135, 141, 147–48 (2009).

One of the exceptions to the exclusionary rule is for inevitable discovery, which "allows for the admission of evidence that would have been discovered even without the unconstitutional source."  Strieff, 136 S. Ct. at 2061.  That exception is akin to the harmless error rule that is applied for constitutional violations generally, a kinship that the Supreme Court pointed out in its Nix opinion.  See Nix v. Williams, 467 U.S. 431, 443 n.4 (1984) ("The ultimate or inevitable discovery exception to the exclusionary rule is closely related in purpose to the harmless-error rule . . . ."); see generally United States v. Roy, 855 F.3d 1133, 1167 (11th

15

Cir. 2017) (en banc) (recognizing that "the harmless error doctrine is alive and well" because it "serves vital interests and promotes public respect for the criminal process").

When there is a reasonable probability that the evidence discovered by a violation of the Fourth Amendment would have turned up anyway, the violation is harmless and in that circumstance "the 'public interest in having juries receive all probative evidence of a crime' outweighs the need to discourage police misconduct." Jefferson v. Fountain, 382 F.3d 1286, 1296 (11th Cir. 2004) (quoting Nix, 467 U.S. at 443).

The Supreme Court has explained that the purpose of the inevitable discovery exception is to "put[] the police in the same, not a worse, position tha[n] they would have been in if no police error or misconduct had occurred." Nix, 467 U.S. at 443; accord United States v. Johnson, 777 F.3d 1270, 1275 (11th Cir. 2015). Excluding evidence where it would have been discovered anyway "would not restore the parties to their previous positions and would upset the careful weighing of competing interests underlying the exclusionary rule." Jefferson, 382 F.3d at 1296. It would "put the police in a worse position than they would have been in if no unlawful conduct had transpired," and would "fail[] to take into account the enormous societal cost of excluding truth in the search for truth in the administration of justice." Nix, 467 U.S. at 445. And it "would place courts in the

16

position of withholding from juries relevant and undoubted truth that would have been available to police absent any unlawful police activity," which would "add[] nothing to either the integrity or fairness of a criminal trial." Id. at 445–46.

Illegally obtained evidence is admissible under the inevitable discovery exception if the government can make two showings. One is a showing that if there had been no constitutional violation there is "a reasonable probability that the evidence in question would have been discovered by lawful means." Johnson, 777 F.3d at 1274 (quotation marks omitted); accord United States v. Terzado-Madruga, 897 F.2d 1099, 1114 (11th Cir. 1990). That does not require establishing an "absolute inevitability of discovery but simply a reasonable probability that the evidence in question would have been discovered other than by the tainted source." United States v. Brookins, 614 F.2d 1037, 1042 n.2 (5th Cir. 1980).[2] The other requirement the government must meet is "that the lawful means which made discovery inevitable were being actively pursued prior to the occurrence of the illegal conduct." Johnson, 777 F.3d at 1274 (quotation marks omitted). But "active pursuit" in this sense does not "require that police have already planned the particular search that would obtain the evidence" but only "that the police would

_____

[2] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit issued before October 1, 1981.

17

have discovered the evidence by virtue of ordinary investigations of evidence or leads already in their possession." Id. (quotation marks omitted).

### B. Application of the Inevitable Discovery Exception

After conducting an evidentiary hearing in this case, the magistrate judge found the three agents to be not just credible but "very credible" and credited their testimony. (The judge found the two defense witnesses whose testimony went to another issue not credible.) The report and recommendation concluded that the motion to suppress should be denied based on the inevitable discovery exception. Watkins' objections brought the matter before the district court. Without hearing any testimony itself, the district court twice rejected the government's inevitable discovery argument. Both times it erred.

### 1. The Reasonable Probability that the Evidence Would Have Been Discovered Anyway

In its initial order suppressing the evidence, the only place that the district court addressed the magistrate judge's finding that the evidence would have been found even without the Fourth Amendment violation is in a two-sentence footnote that stated:

> The Court recognizes that the Magistrate Judge found that even without the tracking of the box, law enforcement would have conducted a "knock and announce" of Defendant's residence in any event. However, in view of the fact that law enforcement did, in fact, track the box with the monitoring device which led them to Defendant's

18

residence, and this Court has concluded a warrant was required, the analysis required by Delancy and Santa must be performed.

Doc. 113 at 9 n.3.

The district court cited the parts of Delancy and Santa that deal with whether consent to search is sufficiently attenuated from a constitutional violation to be voluntary. See Doc. 113 at 9–10 (citing Delancy, 502 F.3d at 1308–10; United States v. Santa, 236 F.3d 662, 676–77 (11th Cir. 2000)). It did not cite the inevitable discovery exception part of Delancy, and Santa did not mention inevitable discovery.

More fundamentally, the fact that a constitutional violation occurred never precludes applying the exception. To the contrary, the inevitable discovery exception does not even come up unless there is a real or assumed constitutional violation to begin with. There must have been a violation for it to make sense to ask whether the violation made a difference. As the Supreme Court has stated: "It is clear that the cases implementing the exclusionary rule begin with the premise that the challenged evidence is in some sense the product of illegal governmental activity." Nix, 467 U.S. at 444 (quotation marks omitted). The Court followed up that observation of the obvious by stating: "[o]f course, this does not end the inquiry," and if that evidence would have been discovered anyway by lawful means "the deterrence rationale has so little basis that the evidence should be

19

received." Id. (footnote omitted).[3] Anything else, the Court stressed, "would reject logic, experience, and common sense." Id.

In its motion for reconsideration, the government pointed out that flaw in the district court's reasoning, and it asked the court to rule that the inevitable discovery exception did apply. In its order denying reconsideration, the court did not insist on its earlier rationale, but stated a new one: "The Court rejects the premise of the Government's motion that, absent the tracking of the package as being located in Defendant's residence, the law enforcement officers would have conducted the 'knock and announce' and the events would have unfolded in the same way."

That replacement reasoning is flawed in three respects. First, it misstates the predictive standard. As we have already pointed out, under binding precedent the standard is not whether the evidence in fact "would have" been discovered, but whether there is a reasonable probability that it would have been. Johnson, 777

---

[3] The footnote at the end of that quotation was about the measure of proof required to establish inevitable discovery. See Nix, 467 U.S. at 444 n.5. Nix was a federal habeas case involving an Iowa conviction, and that state's law required that inevitable discovery be shown by a preponderance of evidence. Id. at 437–38. The defendant contended that the burden should be higher, that it should be proof by clear and convincing evidence. Id. at 439–40. The Supreme Court rejected that contention, holding that proof by a preponderance was enough. Id. at 444 n.5. The Court did not, however, have before it the issue of whether a reasonable probability that the challenged evidence would have been found anyway was enough. See generally id. It said nothing about that issue in Nix or any other decision.

We have consistently held that the government is required to show a reasonable probability that the evidence in question would have been discovered by lawful means. Johnson, 777 F.3d at 1274; Jefferson, 382 F.3d at 1296; Brookins, 614 F.2d at 1042 n.2, 1048. That standard was first announced by our predecessor Court in Brookins, and as we stated in Jefferson: "Since the Nix decision, we have continued to follow the Brookins decision, which is entirely consistent with it." 382 F.3d at 1296.

F.3d at 1274; Jefferson, 382 F.3d at 1296; Terzado-Madruga, 897 F.2d at 1114;

Brookins, 614 F.2d at 1042 n.2.  In concluding that the inevitable discovery

exception did not apply, the district court used the wrong standard.

Second, the district court's reasoning is wrong because it is based on the

district court's own findings of fact instead of those of the magistrate judge.  The

magistrate judge heard all of the testimony and was in a position to make

credibility determinations, and he made findings based on those credibility choices.

The district court did not hear any of the testimony and without conducting its own

evidentiary hearing was in no position to substitute its own credibility

determinations and findings of fact for those of the magistrate judge.  It abused its

discretion in doing so.  See United States v. Powell, 628 F.3d 1254, 1256–57 (11th

Cir. 2010) (recognizing that "a district court abuses its discretion when it squarely

reject[s] the magistrate judge's findings of fact and credibility determinations and

substitute[s] its own, without hearing so much as a single witness") (alterations in

original) (quotation marks omitted); Amlong & Amlong, P.A. v. Denny's, Inc.,

500 F.3d 1230, 1245 (11th Cir. 2007) (noting that our decisions "have

unambiguously and repeatedly observed that a district court may not reject a

magistrate judge's factual and credibility findings" that were based on testimony

the magistrate judge heard, unless the district court conducts its own evidentiary

hearing).

21

Third, and in any event, the district court clearly erred in finding that the government had not established a reasonable probability that if the tracking device had not reactivated and been monitored, the agents would have conducted a knock and talk at Watkins' house that night anyway and with the same result. The evidence the magistrate judge relied on to reach the opposite finding bears repeating. The oddly addressed packages had been received at the post office and taken out of the mail stream by an insider. The person who had done that had also manipulated the post office's internal scan-and-track system to evade detection. To do that, the culprit more than likely was a supervisor. Watkins was a supervisor and was on duty that day. She had also had "issues with the postal service." And when she encountered two of the agents, one of whom she knew to be a postal inspector, in the post office that day, she acted in a highly suspicious way. Before the two agents said anything to her, Watkins appeared anxious, nervous, and scared, her knees buckled, and she seemed ready to faint. When the agents asked if she was okay, she just stared at them. It is no wonder that Watkins was the lead suspect — in fact, the only one.

And it is no wonder that while conducting the search of the post office after it closed, the agents discussed going to Watkins' house and conducting a knock and talk if they did not find the packages at the post office. All three agents testified, without dispute, that even if the tracking device had not come back to life

22

and let them know where one of the packages was, they probably still would have gone to Watkins' house and done the knock and talk just like they did after the tracking device reactivated. They had, after all, already obtained Watkins' address before they knew they would hear from the device again.

Despite all of those facts, which the district court was not at liberty to ignore, the district court dismissed as "purely speculative" the magistrate judge's finding that even if the tracking device had not reactivated, the agents still would have gone to Watkins' house that night and conducted a "knock and announce." The only authority the district court gave for dismissing as pure speculation the magistrate judge's finding about inevitable discovery is the statement in Nix that "inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment." Nix, 467 U.S. at 444 n.5.

But that cuts against what the district court did, not in favor of it, because the magistrate judge's subsidiary and ultimate findings were not based on speculative elements. They were based on historical facts proven by the consistent testimony of three agents, each of whom had personal knowledge of the facts. All of that testimony was subject to verification or impeachment through the usual means employed at evidentiary hearings: examination, cross-examination, and the

23

opportunity to present other evidence. The findings the district court dismissed were not based on speculation, much less "pure speculation."

The magistrate judge's finding of inevitable discovery incorporates an implicit subsidiary finding that if the knock and talk had taken place one or two hours later than it did, Watkins would have reacted the same way she reacted earlier, which would have resulted in discovery of the same incriminating evidence. See Calixto v. Lesmes, 909 F.3d 1079, 1093 (11th Cir. 2018) ("We recognize that in the context of a bench trial we can 'infer[ ] from a . . . court's explicit factual findings and conclusion [other] implied factual findings that are consistent with its judgment although [they are] unstated.") (alterations in original) (citations omitted); United States v. Robertson, 493 F.3d 1322, 1334 (11th Cir. 2007) (inferring that the trial court made implicit findings consistent with its conclusion); United States v. $242,484.00, 389 F.3d 1149, 1154 (11th Cir. 2004) ("[W]e and other federal appellate courts have inferred from a [trial] court's explicit factual findings and conclusion implied factual findings that are consistent with its judgment although unstated."); see generally Hightower v. Terry, 459 F.3d 1067, 1072 n.9 (11th Cir. 2006) ("[A] trial court's dispositive ruling may contain implicit findings, which, though unstated, are necessary to that ruling.").

The district court rejected that implicit finding of the magistrate judge as well, with the same "purely speculative" characterization it applied to the judge's

24

explicit findings. But, like the explicit findings of the magistrate judge, this implicit one was not speculative. It is undisputed that when the agents went to her house after the tracking device reactivated, Watkins was anxious and nervous; she had not been able to get in touch with her co-conspirator; she thought that he had been arrested, leaving her all alone in the crime. The record reveals that he was not in the country at the time, meaning that the person most likely to retrieve the packages from her could not have done so and, as a result, they likely still would have been in her house later that evening.

Within moments after the agents knocked on her door, Watkins began making incriminating statements and let the agents into her house where the packages were. There is no reason at all to believe that an hour or two later that night her reaction to seeing the agents would have changed, that she would not have been anxious and nervous, that she would not have feared her co-conspirator had been caught, or that she would for some other reason not have made the statements she did or let the agents into the house as she did an hour or two earlier. The magistrate judge not only found that "even without the tracker notification to law enforcement that the package was located in Defendant's residence, the agents would have gone to Defendant's home and conducted a knock and talk in this

25

case," the context in which that finding appears makes it clear that the judge also found the agents would have done it that same evening.[4]

Labeling application of the facts underlying an inevitable discovery conclusion as speculation, as the district court did, may have reflected some discomfort with the lack of certainty about what would have happened if something that happened had not happened.  But, as we have said:  "Certainty is illusory in human affairs."  United States v. Roy, 855 F.3d 1133, 1167 (11th Cir. 2017) (en banc).  Which probably is why the law seldom, if ever, requires certainty.

Take, for example, the prejudice element of an ineffective assistance of counsel claim.  For at least a third of a century it has been firmly established that "actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice." Strickland v. Washington, 466 U.S. 668, 693 (1984).  And it has also been

---

[4] The government argued to the magistrate judge that it had "established that . . . law enforcement would have gone to [Watkins'] house that evening to conduct a knock and talk." (Emphasis added.)  The judge found that "law enforcement in the case at hand clearly had reasonable suspicion to conduct a knock and talk at [Watkins'] home on the evening of August 11, 2017, even if" the tracking device had not shown them that one of the packages was in Watkins' house.  (Emphasis added.)  Thereafter, the magistrate judge found that even without the tracking device notification "the agents would have gone to [Watkins'] home and conducted a knock and talk in this case."

There was sufficient evidence to support the finding that it would have been done that night.  The agents who testified at the evidentiary hearing were unanimous that they probably would have conducted a knock and talk at Watkins' house anyway, and they were discussing doing that when the device reactivated.  Not only that, but they felt an urgency to do it before the packages became harder to retrieve.

established just as firmly and for just as long that to meet the prejudice requirement the defendant or petitioner must establish: "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 695 (emphasis added); see also id. (holding that a capital defendant claiming ineffective assistance at the sentence stage must show a reasonable probability of a sentence less than death but for counsel's deficient performance); id. at 694 (pointing out that the reasonable probability of a different result standard is also "the test for materiality of exculpatory information not disclosed to the defense by the prosecution") (citing United States v. Agurs, 427 U.S. 97, 104, 112–113 (1976)). Not certainty, but a reasonable probability.

Applying the reasonable probability standard in ineffective assistance of counsel cases and in cases involving the government's suppression of exculpatory evidence is no less "speculative" than applying a reasonable probability standard in inevitable discovery exception cases in general and this one in particular. Yet the reasonable probability standard has been applied in more than a hundred thousand ineffective assistance of counsel cases since it was announced in the Strickland decision more than a third of a century ago.[5] If application of the standard

---

[5] At last check, the parts of the Strickland decision discussing the prejudice component, including the reasonable probability standard, had been cited by more than 106,000 cases. (That number comes from a Westlaw search on December 3, 2020 for all cases listed as citing the part of the Strickland opinion organized under headnote 19.)

27

involves speculation, there's been a whole lot of speculating going on. See Roy, 855 F.3d at 1167 (discussing the reasonable probability measure used in deciding the prejudice component of ineffective assistance claims and stating that: "If that is speculation, then speculation is rampant in the nation's courts").

The law is comfortable with the reasonable probability standard. To say that applying that standard involves "speculation" is to use the term "in [the] broad sense, which equates with the lack of certainty," and if the lack of certainty is speculation, it "is not impermissible; it is inevitable." Id. at 1166. What we are talking about is not "pure speculation," as the district court put it, but "the exercise of a court's best judgment," id. at 1167, which is part and parcel of the act of judging.

2. Evidence or Leads Already in the Possession of Law Enforcement

Alternatively, or additionally, the district court ruled that the inevitable discovery exception was inapplicable because under our Satterfield decision the lawful means of obtaining the evidence must actually have been pursued before the constitutional violation occurred. See United States v. Satterfield, 743 F.2d 827 (11th Cir. 1984), superseded by statute on other grounds as stated in United States v. Edwards, 728 F.3d 1286, 1292 & n.2 (11th Cir. 2013). The Satterfield decision did say that in the circumstances of that particular case. Id. at 846. The circumstances were that the lawful means by which the evidence in a house would

28

have been discovered was a search warrant that had not been obtained until after the defendant's rights were violated.  See id. at 846–47.  We stressed the importance of that fact, explaining:  "Because a valid search warrant nearly always can be obtained after the search has occurred, a contrary holding would practically destroy the requirement that a warrant for the search of a home be obtained before the search takes place.  Our constitutionally-mandated preference for substituting the judgment of a detached and neutral magistrate for that of a searching officer would be greatly undermined."  Id. (citation omitted).

But we have since made clear Satterfield's requirement that the alternative means of discovery be actively underway at the time of the violation is limited to cases in which the alternative means was a search warrant.  See Johnson, 777 F.3d at 1274–75.  As we have explained: "In Satterfield, we were concerned with the efficacy of the warrant requirement. . . . Any concern about circumnavigating warrants is misplaced here, where no one argues that [the officer] would have applied for a search warrant."  Id. at 1276.  Johnson held that in cases where the means by which the challenged evidence would have been discovered anyway is not a search warrant, "active pursuit" does not require the government to "have already planned the particular [legal] search that would obtain the evidence."  Id. at 1274.  Instead, as we held in Johnson, the government must show only "that the police would have discovered the evidence by virtue of ordinary investigations of

29

<u>evidence or leads already in their possession</u>." <u>Id.</u> (quotation marks omitted) (emphasis added). We stated that requirement is enough to serve the purpose of the active pursuit requirement, which is to "exclude evidence that was not being sought in any fashion." <u>Id.</u> at 1275.

The evidence incriminating Watkins would have been discovered through ongoing investigation and the pursuit of leads that were already in the possession of the agents at the time the device started functioning and they monitored it. She was their lead suspect and for good reason. <u>See</u> <u>supra</u> at pp. 22–23. They had already looked up information about her and had obtained her address. They were discussing doing a knock and talk at her house, which would <u>not</u> have required a search warrant. Not only was it their probable next step, but at the moment the tracking device reactivated, they were actively discussing doing it. And it is not as if the knock and talk is a novel or unfamiliar investigative technique: collectively the agents had done hundreds of them.

## IV.  CONCLUSION

For the reasons we have discussed, not applying the inevitable discovery exception in this case would "put the police in a worse position than they would have been in if no unlawful conduct had transpired," and would "fail[] to take into account the enormous societal cost of excluding truth in the search for truth in the administration of justice." <u>Nix</u>, 467 U.S. at 445. It "would place [us] in the

30

position of withholding from juries relevant and undoubted truth that would have been available to police absent any unlawful police activity." Id.  It would do that while "add[ing] nothing to either the integrity or fairness of a criminal trial." Id. at 446.

The order suppressing the challenged evidence is REVERSED.