[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-14336

_____

D.C. Docket No. 9:17-cr-80222-KAM-2

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

LATECIA WATKINS,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(September 16, 2021)

Before LUCK, ED CARNES, and MARCUS, Circuit Judges.

ED CARNES, Circuit Judge:

The government brought this case here on interlocutory appeal from the

district court's order suppressing evidence in a case involving illegal drugs.  See

United States v. Watkins, 981 F.3d 1224 (11th Cir. 2020).  We reversed the suppression order.  Id. at 1239.  Rehearing en banc was granted, our initial opinion in this case was vacated, and the case was remanded to us for further proceedings consistent with the opinion of the en banc Court.  United States v. Watkins, — F.4th —, No. 18-14336, 2021 WL 3700295, at *5 (11th Cir. Aug. 20, 2021) (en banc).  Our initial opinion remains vacated.  In its place we issue this decision on remand from the en banc Court.

## I.  FACTS

Two packages were sent into this country from Trinidad and Tobago.  Both had cocaine hidden inside.  And both were oddly addressed.  One was addressed to "Margaret Simpson" at the Boca Raton Post Office, but with no post office box number.  The other was addressed to "Jason Stanley" at a UPS Store that was a couple of hundred feet from the Boca Raton Post Office, but there was no box number included in that address either.  The absence of box numbers was notable because neither a post office nor a UPS store accepts packages addressed for delivery there unless the addressee rents a box at that location.

At the international mail facility, after finding cocaine hidden in the two packages, law enforcement agents had removed the drugs from them, placed a GPS tracking device and sham cocaine into each package, and then put both packages into the mail stream, headed to their original destinations.

2

The agents monitored the packages' locations using both the inserted tracking devices and the Postal Service's internal tracking system, which is routinely used on all packages. They also set up surveillance of the Boca Raton Post Office on the morning of August 11, 2017, when they expected the packages to be delivered. But that morning the GPS tracking devices the agents had put into both packages unexpectedly stopped working. That happened around 9:42 a.m.

Unlike the GPS tracking devices used by law enforcement, the Postal Service's routine package tracking system does not continuously pinpoint a package's location as it moves or is stationary. Instead, it uses scans of a package's unique tracking number to show the history of its journey: where the package came into the postal system, some of the stops along the way, and where it was finally delivered. The package is scanned at each stage, and unless it is tampered with, the tracking system automatically updates to the database the location, date, and time a package is manually scanned as it proceeds through the postal system to delivery.

A few of the codes that are routinely entered as a package is scanned while it proceeds along the way are important here. One of them is the code that occurs when a package is scanned as it comes into a post office en route to its final destination; the resulting code shows when the package arrived at the post office.

3

Another code results from the scanning that occurs when the package is delivered to its intended address. That final code records the delivery time.

One wrinkle is that if a package is addressed to a post office box but is too large to fit into that box, it is scanned into the tracking system with the code: "Scanned Notice Left." That means the postal carrier left a notice slip in the recipient's post office box, which she can take to the counter to exchange for her package.

As for the two packages involved in this case, law enforcement agents could tell from the codes produced by the routine postal tracking system that both packages had been on a journey that was not routine. The package addressed to Jason Stanley was reported by the postal tracking system to have arrived (having been scanned in) at the post office at 8:33 a.m. that morning. The system also reported that the package had then been delivered to the UPS store near the post office at 11:06 a.m. But when the agents called the UPS store, they learned that no one named "Jason Stanley" rented a box there, and that no package addressed to that name had been delivered to the store.

The package tracking system also told an odd tale about the package addressed to Margaret Simpson. According to the system, that package had been delivered to the Boca Raton Post Office at 11:06 a.m. that same morning. But, as we've mentioned, there was no post office box number in the address on the

4

package, no one named "Margaret Simpson" rented a post office box there, and without a rented box generally no one could receive mail or a package at that post office. Not only that, but even though the package was too large to fit into a post office box, it had not been scanned as "Scanned Notice Left." And neither of the two packages of (sham) cocaine was anywhere to be seen.

How could all of this be? To the agents all signs pointed to an inside job. A postal employee had to have been helping sneak the packages through the mail system, leaving only a few otherwise inexplicable traces. And the culprit most likely was not just any postal employee. The agents knew that a supervisor would have had what one agent called "unique access to certain aspects" of the scanning system. That unique access would allow a supervisor to scan the two packages in ways that indicated they had arrived and been delivered at times and places they had not been. From the facts they knew, the agents deduced that a supervisor had known that the packages would be arriving, had manipulated their scan history once they did arrive, and had taken the packages.

One postal worker stood out as a suspect: Latecia Watkins. She was a supervisor, which was important. She also had "some issues with the postal service," and one of the agents believed that "her character fit this" crime. Because of their suspicions, the agents looked up Watkins in one of their databases and obtained her driver's license information and home address.

5

The agents' suspicion of Watkins grew throughout the day that the packages were delivered. At one point that day, two of the agents entered the post office to see if they could find the packages. As they were entering, they encountered Watkins. Her response to seeing them, one of whom she knew to be a postal inspector, was dramatic. Even before they had spoken a word to her she appeared anxious, nervous, and scared — so much so that her knees buckled and she looked like she was going to faint. When they asked Watkins if she was okay or if anything was wrong, she just stared at them. Only after the agents told her that they were there to get some documents (which was a ruse) did she finally calm down. Watkins' extreme reaction to seeing them deepened the agents' suspicions that she was involved in smuggling the drugs.

The agents maintained surveillance at the post office until it closed at 6:30 p.m. that same day. As the supervisor in charge of closing the office that night, Watkins was the last employee to leave. No agent followed her or otherwise attempted to surveil her. With the post office closed, the agents decided to enter and search for the packages because they had not noticed anyone leave there with the packages during the day. They expected their search of the post office to take a couple of hours.

As the agents searched the post office, they did not have a fixed plan for what they would do if they did not find the packages there. But, later in testimony

that the magistrate judge credited, the agents stated that their next step "probably" would have been to conduct a knock and talk at Watkins' house, which was located at an address they had already looked up before the tracking device unexpectedly came back to life. The agents would have done a knock and talk anyway because she was their "prime suspect" and, in fact, their only suspect. They did not have "any other leads."

One agent testified that a knock and talk at Watkins' house "was the plan being discussed," and "that was the plan [they] had begun to formulate" and were in the process of formulating when the tracking device began to function again. They had felt pressure to "act[] quickly" because "it would have been exponentially harder to locate the packages" had they not. One of the agents testified that if the device had not come back on they would have done the knock and talk that night anyway after searching the post office instead of waiting until the next day to do it.

But, as we have mentioned, while the search at the post office continued and the agents were discussing their next step, one of the two tracking devices unexpectedly began working again at 8:29 p.m. (Both devices had gone silent nearly eleven hours earlier, around 9:42 a.m. that morning.) The device indicated that it was in a location that the agents immediately recognized as the area where Watkins lived, and they used a Google search to confirm that her house was at that

7

location. At that point, they stopped searching the post office and went immediately to Watkins' house.

At least six law enforcement agents drove there in unmarked vehicles. At least five of the agents approached the front of Watkins' house and three of those five approached her front door wearing tactical vests over civilian clothes. They arrived at the door at around 9:08 p.m.

One of the agents knocked on Watkins' door in a "normal" way, without pounding on it. Before the door opened, at least one of the three agents at the door could smell marijuana, and after Watkins opened the door all three of them could smell marijuana coming from inside the house. At that point, Agent Rivera identified herself as a law enforcement officer and calmly asked Watkins, "Do you know why we are here[?]" In response, Watkins "just put her head down" and answered either, "Yes, the boxes," or, "The packages."

Agent Rivera then asked Watkins to step outside the house so they could talk. She did so. They walked to the end of the driveway, and Agent Rivera asked her, "You know why we [are] here about the boxes." Again, Watkins said "yes." Then Agent Rivera asked her, "Can I take a look at the boxes? Can you show me wh[ere] they are?" At that point, Watkins turned and, without saying anything, began walking back to her house. Though Watkins had not expressly said so, Agent Rivera interpreted her actions as consent to follow her into the house.

Before they actually went into the house, two other agents stopped them so a security sweep could be completed inside the house. The sweep was in response to the smell of marijuana and the agents' concern that the evidence of the marijuana might be destroyed. The agents also planned to apply for a search warrant based on that smell, and one of them did get a warrant after the sweep, but no additional evidence relevant to this case was located through the warrant. During the sweep, which took only a few minutes, the agents found marijuana in plain view. They also saw in plain view two packages lying on the floor in Watkins' bedroom, which they recognized as being the packages with the fake drugs in them.

Once the security sweep was done, Agent Rivera followed Watkins to her bedroom where the packages were. Watkins, who was not in handcuffs, signed written Garrity and Miranda waiver forms, consented to a search of her cellphone, and in a recorded interview made several incriminating statements. See Garrity v. New Jersey, 385 U.S. 493 (1967); Miranda v. Arizona, 384 U.S. 436 (1966). Watkins explained to the agents how she had met her co-defendant, as well as their scheme for him to mail drugs into the country and for her to use her position to get the drugs through the post office without detection. Watkins also told the agents that her co-defendant's telephone was going straight to voicemail when she called it, that she had no other way to get in touch with him, and that she thought he had already been arrested.

9

## II.  PROCEDURAL HISTORY

Watkins was charged with four drug-related crimes.[1]  She moved to suppress "all physical evidence and statements obtained as a result of law enforcement's warrantless installation of and surveillance using tracking devices hidden inside two postal packages."

### A.  The Magistrate Judge's Report and Recommendation

Watkins' motion to suppress was referred to Magistrate Judge William Matthewman.  He held an evidentiary hearing, which included four government witnesses, three of whom were law enforcement agents who had been involved in the search of the post office and the knock and talk at Watkins' house.  Watkins called two of her own witnesses; they had been with her in the house when the law enforcement agents arrived.

The judge issued a report recommending that Watkins' motion be denied.  In it, he expressly and repeatedly found that the testimony of the law enforcement agents was credible in all respects.  He also found that Watkins' witnesses were not

---

[1] Those charges were: Conspiracy to import five kilograms or more of cocaine into the United States, in violation of 21 U.S.C. §§ 963, 952(a), and 960(b)(1)(B) (Count 1); importation of five kilograms or more of cocaine into the United States, in violation of 21 U.S.C. §§ 952(a) and 960(b)(1)(B) (Count 2); conspiracy to possess five kilograms or more of cocaine with the intent to distribute, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A) (Count 3); and attempted possession of five kilograms or more of cocaine with attempt to distribute, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A) (Count 4).

credible.  The facts set out in this opinion are based on those credibility findings and the testimony of the government's witnesses at the evidentiary hearing.

The magistrate judge's report gave several reasons for recommending denial of the motion to suppress.  It said that the initial search and seizure of the two packages was lawful, and that the monitoring of the one tracking device that was functioning inside Watkins' house was also lawful.  In the alternative, the report concluded that even without the reactivated tracking device, law enforcement had reasonable suspicion to do a knock and talk at Watkins' house that night, and that they would have gone to her house to do it anyway.  According to the report, Watkins consented to the agents entering her home, and her consent and all of her incriminating statements were voluntary.  Finally, it concluded that after Watkins opened the door, probable cause and exigent circumstances justified a security sweep of the house because of the marijuana smell and concerns about the destruction of evidence as well as for the safety of the agents.

## B.  The District Court's Orders

Watkins objected to the magistrate judge's report and recommendation. Without conducting a new evidentiary hearing, the district court issued an order sustaining Watkins' objections and granting her motion to suppress.  The court agreed with the magistrate judge that the initial search and placement of the tracking devices by the government was lawful.  But relying on the Supreme

Court's Karo and Jones decisions, the district court concluded that the government had to have a warrant to monitor the tracking device inside Watkins' house because the package was no longer open to visual surveillance from a public place and Watkins had a justified privacy interest in her house. See United States v. Jones, 565 U.S. 400 (2012); United States v. Karo, 468 U.S. 705 (1984). Because the agents did not have a warrant at that time, the court concluded that Watkins' Fourth Amendment rights were violated by the government agents' warrantless monitoring of the tracking device when it reactivated and showed them that the packages were in her house.

The district court also ruled that, even though Watkins' consent to the search of her home was voluntary, that consent was tainted because it was the product of the unlawful monitoring of the tracking device and, for that reason, the attenuation exception to the exclusionary rule did not apply. The court acknowledged that the magistrate judge had "found that even without the tracking of the box, law enforcement would have conducted a 'knock and announce.'" But the district court viewed that finding as irrelevant "in view of the fact that law enforcement did, in fact, track the box with the monitoring device which led them to [Watkins'] residence."

The government filed a motion for reconsideration of the district court's order, contending that the inevitable discovery exception made the evidence

admissible.  It noted that the court had declined to consider the inevitability of the discovery based on the court's finding that law enforcement had illegally tracked one of the packages.  But, as the government pointed out: "analysis under the inevitable discovery doctrine presupposes an illegal search did, in fact, occur, [and] considers whether there is a reasonable probability that the evidence would otherwise have been discovered by lawful means."  It argued that the suppressed evidence would inevitably have been discovered anyway because, even before the tracking device came back to life, Watkins was the sole suspect; and the agents had already searched for and found her address; and they testified that going to Watkins' house that same night to do a knock and talk was probably the next step in their investigation.  They had no other leads.

The district court denied the motion to reconsider.  First, the court stated that it was "purely speculative to conclude" that law enforcement agents would have gone to Watkins' house after they completed their search at the post office, and that Watkins would have responded in the same way if they had approached her house "at a different time and under different circumstances."  Second, the court ruled that the inevitable discovery exception did not apply because, the court found, although the lawful means of obtaining the evidence — the knock and talk — was being considered, it "was not actually being pursued when the unlawful

13

tracking occurred, and law enforcement abandoned their search of the post office to approach" Watkins' house.

## III. ANALYSIS

In its brief to this Court, the government concedes that law enforcement violated Watkins' Fourth Amendment rights by the warrantless monitoring of the tracking device once it reactivated inside Watkins' house.  We are not bound to accept that concession, see Roberts v. Galen of Va., Inc., 525 U.S. 249, 253 (1999), but for purposes of this case we will.

### A. The Exclusionary Rule and the Ultimate Discovery Exception

A Fourth Amendment violation can trigger the exclusionary rule, which requires courts to suppress illegally obtained evidence, but that rule has several exceptions.  Exceptions exist because the exclusionary rule "has always been our last resort, not our first impulse."  Utah v. Strieff, 136 S. Ct. 2056, 2061 (2016) (quotation marks omitted).  We are not quick to "indiscriminate[ly] appl[y]" the rule because it "generates substantial social costs, which sometimes include setting the guilty free and the dangerous at large" and which take a "costly toll upon truth-seeking and law enforcement objectives."  United States v. Delancy, 502 F.3d 1297, 1314 (11th Cir. 2007) (quoting Hudson v. Michigan, 547 U.S. 586, 591 (2006)).  Instead, we reserve the exclusionary rule "only [for] where its remedial objectives are thought most efficaciously served — that is, where its deterrence

14

benefits outweigh its substantial social costs." Id. (quoting Hudson, 547 U.S. at 591). And to justify application of the rule those deterrence benefits cannot be merely incremental, marginal, or simply possible; they must be substantial and must actually outweigh the costs. Herring v. United States, 555 U.S. 135, 141, 147–48 (2009).

One of the exceptions to the exclusionary rule is for inevitable or ultimate discovery, which "allows for the admission of evidence that would have been discovered even without the unconstitutional source." Strieff, 136 S. Ct. at 2061. This exception is akin to the harmless error rule that is applied for constitutional violations generally, a kinship that the Supreme Court pointed out in its Nix opinion. See Nix v. Williams, 467 U.S. 431, 443 n.4 (1984) ("The ultimate or inevitable discovery exception to the exclusionary rule is closely related in purpose to the harmless-error rule . . . ."); see generally United States v. Roy, 855 F.3d 1133, 1167 (11th Cir. 2017) (en banc) (recognizing that "the harmless error doctrine is alive and well" because it "serves vital interests and promotes public respect for the criminal process").

"If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received." Nix, 467 U.S. at 443 (footnote omitted), accord Watkins, 2021 WL

15

3700295, at *5 ("[W]e hold that the standard of predictive proof the government

must satisfy in order to establish the proper application of the ultimate discovery

exception is preponderance of the evidence . . . ."). As the Supreme Court has

explained: "Anything less would reject logic, experience, and common sense."

Nix, 467 U.S. at 444. The reason it would is that the purpose of the ultimate

discovery exception is to "put[] the police in the same, not a worse, position tha[n]

they would have been in if no police error or misconduct had occurred." Id. at

443; accord United States v. Johnson, 777 F.3d 1270, 1275 (11th Cir. 2015),

overruled by Watkins, 2021 WL 3700295.[2] Excluding evidence where it would

have been discovered anyway "would not restore the parties to their previous

positions and would upset the careful weighing of competing interests underlying

the exclusionary rule." Jefferson v. Fountain, 382 F.3d 1286, 1296 (11th Cir.

2004), overruled by Watkins, 2021 WL 3700295. It would "put the police in a

worse position than they would have been in if no unlawful conduct had

transpired," and would "fail[] to take into account the enormous societal cost of

excluding truth in the search for truth in the administration of justice." Nix, 467

U.S. at 445. Courts would be "withholding from juries relevant and undoubted

---

[2] Johnson, like many of our other earlier decisions, applied the "reasonable probability" standard. See Johnson, 777 F.3d at 1274. We rejected that standard in our en banc decision in this case and adopted the preponderance of the evidence standard instead, Watkins, 2021 WL 3700295, at *5. Our en banc decision overruled decisions like Johnson only to the extent that they applied the reasonable probability standard.

truth that would have been available to police absent any unlawful police activity," which would "add[] nothing to either the integrity or fairness of a criminal trial." Id. at 445–46.

Illegally obtained evidence is admissible under the ultimate discovery exception if the government can make two showings. One is a showing by a preponderance of the evidence that if there had been no constitutional violation, the evidence in question would have been discovered by lawful means. Nix, 467 U.S. at 444. Absolute certainty is not required, only a showing that it is more likely than not the evidence would have been discovered without the violation. See Bourjaily v. United States, 483 U.S. 171, 176 (1987) (summarizing Nix as holding that "inevitable discovery of illegally seized evidence must be shown to have been more likely than not"); Watkins, 2021 WL 3700295, at *5.

The other requirement the government must meet is "that the lawful means which made discovery inevitable were being actively pursued prior to the occurrence of the illegal conduct." Johnson, 777 F.3d at 1274 (quotation marks omitted). "Active pursuit" in this sense does not "require that police have already planned the particular search that would obtain the evidence" but only "that the police would have discovered the evidence by virtue of ordinary investigations of evidence or leads already in their possession." Id. (quotation marks omitted).

17

## B. Application of the Ultimate Discovery Exception

After conducting an evidentiary hearing in this case, the magistrate judge found the three agents to be not just credible but "very credible" and credited their testimony. (He also found the two defense witnesses whose testimony went to another issue not credible.) The report and recommendation concluded that the motion to suppress should be denied based on the ultimate discovery exception. Watkins' objections brought the matter before the district court. Without hearing any testimony itself, the district court twice rejected the government's inevitable or ultimate discovery argument. Both times it erred.

### 1. Whether the Evidence Would Have Been Discovered Anyway

In its initial order suppressing the evidence, the only place that the district court addressed the magistrate judge's finding that the evidence ultimately would have been found even without the Fourth Amendment violation is in a two-sentence footnote that stated:

> The Court recognizes that the Magistrate Judge found that even without the tracking of the box, law enforcement would have conducted a "knock and announce" of Defendant's residence in any event. However, in view of the fact that law enforcement did, in fact, track the box with the monitoring device which led them to Defendant's residence, and this Court has concluded a warrant was required, the analysis required by Delancy and Santa must be performed.

Doc. 113 at 9 n.3.

18

The district court cited the parts of Delancy and Santa that deal with whether consent to search is sufficiently attenuated from a constitutional violation to be voluntary.  See Doc. 113 at 9–10 (citing Delancy, 502 F.3d at 1308–10; United States v. Santa, 236 F.3d 662, 676–77 (11th Cir. 2000)).  The court did not cite the ultimate discovery exception part of Delancy, and Santa did not mention ultimate discovery.

More fundamentally, the fact that a constitutional violation occurred never precludes applying the exception.  To the contrary, the ultimate discovery exception does not even come up unless there is a real or assumed constitutional violation to begin with.  There must be a real or assumed violation for it to make any sense to ask whether the violation made a difference.  As the Supreme Court has observed: "It is clear that the cases implementing the exclusionary rule begin with the premise that the challenged evidence is in some sense the product of illegal governmental activity."  Nix, 467 U.S. at 444 (quotation marks omitted).  The Court followed up that observation of the obvious by stating: "[o]f course, this does not end the inquiry," and if that evidence would have been discovered anyway by lawful means "the deterrence rationale has so little basis that the evidence should be received."  Id. (footnote omitted).  Anything else, the Court stressed, "would reject logic, experience, and common sense."  Id.

19

In its motion for reconsideration, the government pointed out this flaw in its reasoning to the district court and asked the court to rule that the ultimate discovery exception did apply.  In its order denying reconsideration, the court did not stick with its earlier rationale, but replaced it with this one: "The Court rejects the premise of the Government's motion that, absent the tracking of the package as being located in Defendant's residence, the law enforcement officers would have conducted the 'knock and announce' and the events would have unfolded in the same way."

That replacement rationale is flawed in two respects.  First, it arguably misstates the predictive standard.  The standard is not whether the evidence in fact "would have" been discovered, but whether the preponderance of the evidence indicates it would have been — whether it more likely than not would have been. Bourjaily, 483 U.S. at 176; Watkins, 2021 WL 3700295, at *5.

Second, the district court's reasoning is wrong because it is based on that court's own findings of fact instead of those of the magistrate judge.  The magistrate judge heard all of the testimony and was in a position to make credibility determinations, and he made findings based on his credibility choices. The district court did not hear any of the testimony and without conducting its own evidentiary hearing was in no position to substitute its own credibility determinations and findings of fact for those of the magistrate judge.  It abused its

20

discretion in doing so.  See United States v. Powell, 628 F.3d 1254, 1256–57 (11th Cir. 2010) (recognizing that "a district court abuses its discretion when it squarely reject[s] the magistrate judge's findings of fact and credibility determinations and substitute[s] its own, without hearing so much as a single witness") (alterations in original) (quotation marks omitted); Amlong & Amlong, P.A. v. Denny's, Inc., 500 F.3d 1230, 1245 (11th Cir. 2007) (noting that our decisions "have unambiguously and repeatedly observed that a district court may not reject a magistrate judge's factual and credibility findings" that were based on testimony the magistrate judge heard, unless the district court conducts its own evidentiary hearing).

Third, given the magistrate judge's findings, which the district court was bound to accept unless it held its own evidentiary hearing, the court clearly erred in finding that the government had failed to prove by a preponderance of the evidence that if the tracking device hadn't reactivated and been monitored, the agents would have conducted a knock and talk at Watkins' house that night anyway and with the same result.

The evidence the magistrate judge relied on to reach the opposite finding bears repeating.  The oddly addressed packages had been received at the post office and taken out of the mail stream by an insider.  The person who had done that had also manipulated the post office's internal scan-and-track system to evade

21

detection. To do that, the culprit more than likely had to be a supervisor. Watkins was a supervisor and was on duty that day. She had also had "issues with the postal service." And when she encountered two of the agents, one of whom she knew to be a postal inspector, in the post office that day, she acted in a highly suspicious way. Before the two agents said anything to her, Watkins appeared anxious, nervous, and scared, her knees buckled, and she seemed ready to faint. When the agents asked if she was okay, she just stared at them. It is no wonder that Watkins was the lead suspect — in fact, the only suspect.

And it is no wonder that while conducting the search of the post office after it closed, the agents discussed going to Watkins' house and conducting a knock and talk if they did not find the packages at the post office. All three agents testified, without dispute, that even if the tracking device had not come back to life and let them know where one of the packages was, they probably still would have gone to Watkins' house and done the knock and talk just like they did after the tracking device reactivated. They had, after all, already obtained Watkins' address before they knew they would hear from the device again. The magistrate judge found all of that testimony credible.

Despite all of those facts, which the district court was not at liberty to ignore, it dismissed as "purely speculative" the magistrate judge's finding that even if the tracking device had not reactivated, the agents still would have gone to

Watkins' house that night and conducted a "knock and announce." The only authority the district court gave for dismissing that finding as pure speculation is the statement in Nix that "inevitable discovery involves no speculative elements but focuses on demonstrated historical facts capable of ready verification or impeachment." Nix, 467 U.S. at 444 n.5.

But that statement in Nix cuts against what the district court did, not in favor of it, because the magistrate judge's subsidiary and ultimate findings were not based on speculative elements. They were based on historical facts proven by the consistent testimony of three agents, each of whom had personal knowledge of the facts. All of that testimony was subject to verification or impeachment through the usual means employed at evidentiary hearings: examination, cross-examination, and the opportunity to present other evidence. The findings the district court dismissed were not based on speculation, much less "pure speculation."

The magistrate judge's finding of ultimate or inevitable discovery incorporates an implicit subsidiary finding that if the knock and talk had taken place one or two hours later than it did, Watkins would have reacted the same way she actually had earlier, which would have resulted in discovery of the same incriminating evidence. See Calixto v. Lesmes, 909 F.3d 1079, 1093 (11th Cir. 2018) ("We recognize that in the context of a bench trial we can 'infer[ ] from a . . . court's explicit factual findings and conclusion [other] implied factual

23

findings that are consistent with its judgment although [they are] unstated.")
(alterations in original) (citations omitted); United States v. Robertson, 493 F.3d
1322, 1334 (11th Cir. 2007) (inferring that the trial court made implicit findings
consistent with its conclusion); United States v. $242,484.00, 389 F.3d 1149, 1154
(11th Cir. 2004) ("[W]e and other federal appellate courts have inferred from a
[trial] court's explicit factual findings and conclusion implied factual findings that
are consistent with its judgment although unstated."); see generally Hightower v.
Terry, 459 F.3d 1067, 1072 n.9 (11th Cir. 2006) ("[A] trial court's dispositive
ruling may contain implicit findings, which, though unstated, are necessary to that
ruling.").

The district court rejected that implicit finding of the magistrate judge with
the same "purely speculative" characterization it had applied to the judge's explicit
findings.  But, like the explicit findings of the magistrate judge, this implicit one
was not speculative.  It is undisputed that when the agents went to her house after
the tracking device reactivated, Watkins was anxious and nervous; she had not
been able to get in touch with her co-conspirator; she thought that he had been
arrested, leaving her all alone in the crime.  The record reveals that he was not in
the country at the time, meaning that the person most likely to retrieve the
packages from her could not have done so and, as a result, they likely still would
have been in her house later that evening.

24

Within moments after the agents knocked on her door, Watkins began making incriminating statements and let the agents into her house where the packages were.  There is no reason at all to believe that an hour or two later that night her reaction to seeing the agents would have changed: that she would not have been anxious and nervous, that she would not have feared her co-conspirator had been caught, or that for some other reason she would not have made the statements she did or let the agents into the house as she did an hour or two earlier. The magistrate judge not only found that "even without the tracker notification to law enforcement that the package was located in Defendant's residence, the agents would have gone to Defendant's home and conducted a knock and talk in this case," the context in which that finding appears makes it clear that the judge also found the agents would have done it that same evening.[3]

The district court's rejection of the magistrate judge's ultimate or inevitable discovery finding as speculation may have reflected discomfort with the lack of

---

[3] The government argued to the magistrate judge that it had "established that . . . law enforcement would have gone to [Watkins'] house that evening to conduct a knock and talk." (Emphasis added.)  The judge found that "law enforcement in the case at hand clearly had reasonable suspicion to conduct a knock and talk at [Watkins'] home on the evening of August 11, 2017, even if" the tracking device had not shown them that one of the packages was in Watkins' house.  (Emphasis added.)  And given that reasonable suspicion, the magistrate judge found, even without the tracking device notification "the agents would have gone to [Watkins'] home and conducted a knock and talk in this case."

There was sufficient evidence to support the finding that the knock and talk would have been done that night.  The agents who testified at the evidentiary hearing were unanimous that they probably would have conducted a knock and talk at Watkins' house anyway, and they were discussing doing that when the device reactivated.  And they also felt an urgency to do it before the packages became harder to retrieve.

certainty about what would have happened if something that happened had not happened. But, as we have said: "Certainty is illusory in human affairs." United States v. Roy, 855 F.3d 1133, 1167 (11th Cir. 2017) (en banc). Which probably is why the law seldom, if ever, requires certainty. Instead of certainty, what the law requires in ultimate discovery determinations is only that it be more likely than not the evidence would have been discovered without the constitutional violation. Bourjaily, 483 U.S. at 176; Watkins, 2021 WL 3700295, at *5.

    2. Evidence or Leads Already in the Possession of Law Enforcement

The district court gave another reason for its ruling that the inevitable or ultimate discovery exception was inapplicable: under our Satterfield decision and others, "the prosecution must demonstrate that the lawful means which made discovery inevitable were possessed by the police and were being actively pursued prior to the occurrence of the illegal conduct [of the police]." United States v. Satterfield, 743 F.2d 827, 846 (11th Cir. 1984) (emphasis in original), superseded by statute on other grounds as stated in United States v. Edwards, 728 F.3d 1286, 1292 & n.2 (11th Cir. 2013). The Satterfield decision did say that in the circumstances of that particular case. Id. at 846. Those circumstances were that the lawful means by which the evidence in a house would have been discovered was a search warrant that had not been obtained until after the defendant's rights were violated. See id. at 846–47. We stressed the importance of that fact,

26

explaining: "Because a valid search warrant nearly always can be obtained after the search has occurred, a contrary holding would practically destroy the requirement that a warrant for the search of a home be obtained before the search takes place.  Our constitutionally-mandated preference for substituting the judgment of a detached and neutral magistrate for that of a searching officer would be greatly undermined."  Id. (citation omitted).

We have since made clear Satterfield's requirement that the alternative means of discovery be actively underway before the constitutional violation occurs is limited to cases where that alternative means of discovery is a search warrant. See Johnson, 777 F.3d at 1274–75.  As we have explained: "In Satterfield, we were concerned with the efficacy of the warrant requirement. . . . Any concern about circumnavigating warrants is misplaced here, where no one argues that [the officer] would have applied for a search warrant."  Id. at 1276.

Johnson held that in cases where the means by which the challenged evidence would have been discovered anyway is not a search warrant, "active pursuit" does not require the government to "have already planned the particular [legal] search that would obtain the evidence."  Id. at 1274.  Instead, the government must show only "that the police would have discovered the evidence by virtue of ordinary investigations of evidence or leads already in their possession."  Id. (quotation marks omitted) (emphasis added).  That requirement,

we noted, is enough to serve the purpose of the active pursuit requirement, which is to "exclude evidence that was not being sought in any fashion." Id. at 1275.

The evidence incriminating Watkins would have been discovered through ongoing investigation and the pursuit of leads that were already in the possession of the agents at the time the device started functioning and they monitored it. She was their lead suspect and for good reason. See supra at pp. 22–23. They had already looked up information about her and obtained her address. They were discussing doing a knock and talk at her house, which would not have required a search warrant. Not only was it their probable next step, but at the moment the tracking device reactivated, they were actively discussing doing it. And it is not as if the knock and talk is a novel or unfamiliar investigative technique: collectively the agents had done hundreds of them.

## IV. THE SCOPE OF THE REMAND

If the district court does not hold an evidentiary hearing itself, it is bound to accept the fact findings of the magistrate judge, and the testimony of the law enforcement witnesses, all of whom the magistrate judge found to be fully credible. If accepted, those predicate findings and that testimony compel the end finding that it is more likely than not the challenged evidence ultimately would have been discovered, without the constitutional violation, through lawful means and investigation of evidence or leads already in the officer's possession. Any

28

contrary finding about ultimate discovery would be clearly erroneous if the magistrate judge's predicate findings are used, as they must be absent a new evidentiary hearing.

At the time the district court entered the suppression order, the law of this circuit was that the prospects of ultimate discovery were to be gauged under the reasonable probability standard. The controlling standard has changed. It is now the preponderance of the evidence, more likely than not, standard. Under the historical or subsidiary facts the magistrate judge found, every reasonable factfinder would find that it was more likely than not the challenged evidence ultimately would have been discovered without the constitutional violation. The contrary finding would be clearly erroneous. But if the historical or subsidiary fact findings change, the predictive fact finding may change as well.

We are remanding the case to the district court to give it an opportunity to decide in its discretion whether to conduct a do-over evidentiary hearing or to accept the fact findings the magistrate judge made after conducting the hearing that he did. If the district court decides not to hold another evidentiary hearing, it should enter an order denying the motion to suppress. If the court does decide to

conduct another evidentiary hearing, it should make credibility decisions, enter fact findings of its own, and rule on the motion to suppress based on those findings.

If another appeal results from the district court's ruling on remand, the Clerk's Office is directed to treat that appeal as it would the return of a case from a limited remand so that any appeal of a future suppression order will return to this panel, given our familiarity with the record and issues. See, e.g., Ballard v. Comm'r, 429 F.3d 1026, 1027 (11th Cir. 2005) ("This is a limited remand, and should either party seek appellate review following this new ruling by the Tax Court, such appeal should be assigned to this panel.") (footnote omitted); Pettway v. Am. Cast Iron Pipe Co., 681 F.2d 1259, 1269 (11th Cir. 1982) ("We retain jurisdiction so that if either party is dissatisfied with the district court's order, on remand the matter can come back to the same panel. . . . That course will promote efficiency and spare three other members of this Court the task of wading through" the record.); see also United States v. Hough, 803 F.3d 1181, 1196 (11th Cir. 2015) ("These circumstances call for a limited remand.").

## V.  CONCLUSION

The suppression order is REVERSED, and the matter is REMANDED to the district court for further proceedings consistent with this opinion.

30